JAMES W. RICHARDSON, Respondent, v. PETER B. CRANDALL, Appellant.

Where one furnishing men to fill the quotas of certain towns, under a call of the president, at the requirement of the provost marshal, deposited with him county bonds, under a parol agreement that they should be held as security at the rate of $550 per man, that the men then and thereafter to be furnished by him should not desert before reaching the place of rendezvous,—*Held*, that the agreement was void, under the statute of frauds, it being an agreement to answer for the default or miscarriage of another, and was not so far executed, by the delivery of the securities, as to give the officer an interest in or right to retain them.

· Under the act of congress of 1863 (12 U. S. Stat. at Large, 731), "for enrolling and calling out the national forces," etc., it was the duty of the provost marshal, when men were presented for enlistment, if he found them of suitable age and "not physically or morally unfit for service," to enlist and muster them in. He had no right to reject them, because he thought they would desert, nor to require security against desertion; therefore, aside from the provisions of the statute of frauds, the pledge of such bonds was illegally exacted, and was void, as taken *colore officii*.

If he had a discretion in receiving or rejecting the men presented, it was his duty to have exercised this discretion, under his oath of office, uninfluenced by the security which he exacted. In this view of the case also, the pledge must be considered as against public policy, and taken *colore officii*.

The statute of this State, as to securities taken *colore officii*, does not apply to officers of the United States, but the illegality of such a pledge is determined by the principles of public policy, as sanctioned by the common law.

In order to condemn a security, as taken by a public officer *colore officii*, it is not necessary to show it was taken with an evil or corrupt intent. The officer may not legally exact a bond before he will perform a plain duty or when it tends to a lax performance of duty, although there be no actual corrupt motive. The law looks not to any particular contract to see that it is free from taint of actual fraud, oppression or corruption, but it looks to the general tendency of such contract, and it is condemned if it belongs to a class which the law will not tolerate.

The common-law prohibition is aimed at the public officer, not at the one yielding to his exactions; the parties are not upon an equal footing; and when the former receives securities or money, contrary to those prohibitions, the parties are not *in pari delictu*.

The agreement in this case was also void, as without consideration.

(Argued September 28, 1871; decided January term, 1872.)

APPEAL from an order of the General Term of the Supreme Court, in the fifth judicial district, reversing a judgment in favor of defendant, entered on the decision of the court on a trial, without a jury.

The action was brought by the plaintiff to recover the possession of twenty-two war loan bonds, issued by the county of Oneida, of the estimated value of $20,000, and damages for the unlawful detention thereof from him.

The complaint sets forth facts showing the plaintiff's ownership of the said bonds, under a title derived from Aaron Richardson, the former lawful owner and holder thereof, and that the defendant, on demand, refused to deliver the same, or any part thereof, and that he wrongfully withheld the possession of them.

The defendant, by his answer, after denying the allegations of the plaintiff in his complaint, sets up as a defence that he, on the 30th day of January, 1865, and before and after that time, was provost marshal of the twenty-first congressional district of this State, under the laws of congress, and as such was engaged in enlisting, mustering and swearing men into the military service of the United States, under the call of the president, made on December, 19, 1864; that the bonds mentioned in the complaint were, on his requirement, deposited by the said Aaron Richardson, from whom the plaintiff derived his title thereto, as a security, to the amount of $550 per man, that the men then and thereafter to be presented by him, for and on behalf of certain towns for enlistment, and who should be mustered and sworn into the military service of the United States, by him, the said provost marshal, would, after being so mustered and sworn, go forward and be received at the designated rendezvous, or in other words, would not desert the service before reaching such rendezvous; that of the men so presented by the said Richardson, and mustered and sworn into such service, thirty-two men did desert the same before reaching said rendezvous, and were not received thereat, but escaped on the way thereto. He then alleges facts, giving him reason to apprehend desertion, and that it

was under such circumstances, and to guard against such apprehended desertion, that he required the deposit of the bonds, and that he as such provost marshal reported the receipt of such bonds, and the agreement upon which they were received, to John A. Haddock, assistant provost marshal general for the State of New York, and to General J. B. Fry, provost marshal general at Washington, and requested orders respecting the disposition of the same.

The judge who tried the issues found the facts in reference to the ownership and possession of the bonds by the plaintiff, the demand thereof from the defendant and his refusal to deliver the same to be substantially as alleged in the complaint, and that they were deposited with the defendant for the purpose and under the circumstances stated in his answer; that the agreement by and under which such deposit was made was by parol; that the facts were reported by defendant to his superior officers, and that of the number of men presented, mustered and sworn into the service of the United States, twenty-four men did desert the same before reaching said rendezvous and were not received thereat, but escaped on the way thereto. He further found that "the said agreement was fully executed before the commencement of this suit, and nothing remained to be done by either party to consummate or give effect thereto."

As conclusions of law from the said facts he found and decided that the defendant was entitled to hold and retain the possession of the said bonds, and he thereupon ordered judgment directing the return of the said bonds to the defendant, and that the complaint be dismissed with costs.

Exceptions were taken by the plaintiff to so much of the said findings as found that the making and completion of the said agreement and the holding of the said bonds in pursuance thereof by the defendant was reported to his superior officers; that the agreement was fully executed before the commencement of this action, and nothing remained to be done by either party to consummate or give effect thereto, and also to the above conclusions of law. Exceptions were also

taken by the plaintiff to the refusal of the said judge to find that the United States government had never ratified or otherwise approved of the defendant's transactions in reference to the said bonds; that it made no claim thereto, that the defendant had never turned them over to the United States, and that he himself had no personal interest in them.

Some exceptions were also taken during the process of the trial, which, so far as they are material to the decision in this court, are sufficiently refered to in the following opinions.

*Francis Kernan* for appellant. The securities were not taken *colore officii*, in violation of any statute. (*Webb* v. *Albertson*, 4 Barb., 57; *Dole* v. *Bull et al.*, 2 John. Cases, 239; *Acker* v. *Burrall*, 21 Wend., 605–607; *Burrall* v. *Acker*, 23 Wend., 606–608; *Chamberlain* v. *Buller*, 18 N. Y., 115–118; *Mott* v. *Robbins*, 1 Hill, 21; *The State* v. *City of Buffalo*, 2 Hill, 434; *Harp* v. *Osgood*, 2 Hill, 216; *Commissioners of Highways* v. *Peck*, 5 Hill, 215; *Lenthal* v. *Cooke*, 1 Saund., 161; 1 Leving, 254; 2 Salk., 438; *Dole* v. *Bull*, 2 J. C., 239.) The contract in question was not in violation of any principle of the common law. (*Lenthal* v. *Cooke*, 1 Saund., 161; 1 Leving, 254; 2 Salk., 438; *Dole* v. *Bull*, 2 J. C., 239; *Acker* v. *Burrall*, 21 Wend., 605; 23 Wend., 606; 18 N. Y., 115–118; 2 Hill, 216–218.) It was not taken for a corrupt, illegal or improper purpose. (*Grant* v. *Morse*, 22 N. Y., 323–5; *Cannan* v. *Pultz*, 21 N. Y., 547; *Chubbuck* v. *Vernam*, 42 N. Y., 432.) But if the contract was illegal, the parties were *in pari delictu*, and the court will not afford relief to either. (*Nellis* v. *Clark*, 4 Hill, 424; *Staples* v. *Gould*, 5 Seld., 520; *Schermerhorn* v. *Tallman*, 14 N. Y., 94, 141; *Sackett's Harbor Bank* v. *Codd*, 18 N. Y., 240; *Oneida Bank* v. *Ontario Bank*, 21 N. Y., 496; *Tracy* v. *Talmadge*, 14 N. Y., 162.) If the official duty of defendant did not extend to taking the securities, the government could ratify the contract and avail itself of its benefits. (*Harp* v. *Osgood*, 2 Hill, 216; *The State* v. *The City of Buffalo*, per NELSON, J., 2 Hill, 434; Story on Agency,

§ 244; 4 Bing., 722; *McLean* v. *Dunn*, 15 E. C. L., 129; *Pilkington* v. *Green*, 2 B. & P.,' 151.) It was within the scope of defendant's duties to take all reasonable measures against desertion. (Laws 37th Cong., 3d sess., 126, 127, §§ 4, 7.)

*Geo. F. Comstock* and *Lyman Tremain* for respondent. The transaction in question falls directly within the statute of the State against taking securities *colore officii*, and within the policy and rules of law on which statutes of this nature are founded. (1 Hill, 298 ; 4 Sand. S. C., 466 ; 1 Com., 365; 2 R. S., 286, § 56 ; 4 Barb., 51 ; 2 Bulst., 213 ; 5 Wend., 61; Plowd., 60 ; 10 Coke, 99 ; Yelverton, 197 ; 6 Porter, 335; 30 Mississippi, 624; 19 Wend., 194; 21 id., 58 ; 7 John., 159, 426; 8 id., 98.)

The contract was void under the statute of frauds, and the pledge can be recovered. (15 J., 503 ; *Cagger* v. *Lansing*, 43 N. Y., 550.) The parties were not *in pari delictu*. (*Oneida Bank* v. *Ontario Bank*, 21 N. Y., 496 ; *Sackett's Harbor Bank* v. *Codd*, 18 id., 240 ; *Tracy* v. *Talmadge*, 11 N. Y., 162, 183 to 190; Story on Agency, §§ 301, 307, 320.) A pledge until foreclosed is an executory contract; and if invalid, the pledgor may demand and recover possession. (Story on Bailments, §§ 266, 287, 300, 450, 582 ; 12 Johns, 146; 4 Denio, 227 ; 4 Barb., 491 ; 10 Johns., 471; 5 Denio, 269 ; 1 Peters, 37 ; 14 Johns., 435 ; 24 Wend., 230; 7 Cow., 290 ; 2 Hill, 524.) Defendant cannot without interpleader set up the rights of the United States or any third party. (36 N. Y., 17 ; 37 N. Y., 256 ; 33 N. Y., 658; 29 N. Y., 554.) The grantees were not *in pari delictu*. (47 Barb., 345–355, cases cited ; *Aubrey* v. *Fish*, 36 N. Y., 47.) The case is not within that principle, as the plaintiff asks no assistance from the transaction. (Chitty on Contracts, 657 ; see also, to the same effect, *Sunson* v. *Bloss*, 7 Taunt., 246 ; S. C., 2 Marsh, 542 ; *Dobree* v. *Napier*, 2 Bing., N. C., 796; *Pellscott* v. *Angell*, 2 C. M. & R., 313 ; *Callaghan* v. *Hallett*, 1 Caines, 104; *Forsyth* v. *State*, 6 Ohio, 21 ; *Swan* v. *Scott*, 11 Serg. & Rawl., 164.)

LOTT, Ch. C. It appears by the case that the plaintiff, on the trial of the issues, introduced sufficient evidence to prove the ownership and possession of the bonds in question by Aaron Richardson on the thirtieth day of January, 1865; that he on that day deposited them with the defendant and left them in his possession; that he afterwards, and on the four teenth day of March, 1865, for a good and valuable consideration, sold and assigned the same and the money secured thereby to the plaintiff in this action; that the plaintiff after such sale and transfer to him and before the commencement of this action demanded the said bonds, each and all of them, of and from the said defendant, and that he refused to deliver them.

After that proof had been so given by the plaintiff, he rested his case, and the defendant then offered and introduced testimony tending to sustain and establish the several allegations in his answer. It was thereupon objected on the part of the plaintiff, among other grounds of objection thereto, that the agreement in relation to the deposit of the said bonds was void within the statute of frauds, being a special promise or undertaking, by parol and not in writing, to answer for the default or miscarriage of another person. This objection was well taken. The plaintiff's title to the bonds was clearly established by the evidence introduced by him; and although it also appeared that his assignor, while owner thereof, had deposited them with the defendant and left them in his possession, it was not shown that they were so deposited or left with him as provost marshal or as a public officer, or otherwise than in his individual capacity, as a mere naked bailee thereof, holding the same as the plaintiff's property, subject to his control and disposition thereof, and having himself no interest therein, either personally or as trustee or otherwise, or any right whatever, to retain the same in hostility adversely to the claim or demand of the plaintiff. It, therefore, was incumbent on him to show a right to retain them, and a justification of his refusal to deliver them to the plaintiff on his demand thereof. This he undertook to do by

proving the agreement in question; which was an undertaking or obligation on his part that the enlisted men should go forward to the place of rendezvous, and that they would not, before reaching there, desert the service. Such an agreement, to be of any validity, must be in writing; and that in question being verbal only, was not admissible as evidence, and having been given against the exception of the plaintiff was insufficient to give the defendant an interest in the said bonds or any right to retain the possession thereof. (See *Rice* v. *Peet*, 15 Johns. Rep., 503.)

To overcome the force and validity of that and some other objections urged against the claim of the defendant, the learned judge who tried the issues has found that "the said agreement was fully executed before the commencement of this suit, and nothing remained to be done by either party to consummate and give effect thereto," and in his opinion, to support the finding, he says, " the obvious answer to these suggestions is, that this is not an action upon the agreement. If it was, there might be force in the objection; but after a party has voluntarily performed an agreement, it is too late for him to urge, either that it was not attended by those formal solemnities to a perfect execution which the law requires, or was not upheld by a sufficient consideration. The party waived all these, even if he might originally have insisted upon them, by doing the thing which he contracted to do; and his *locus penitentiæ*, if he ever had any, has long since passed." This, with all proper deference to the opinion of the learned judge, is not an " obvious answer," but is specious, and does not, in fact, answer the objection. It is true, as he says, that this is not an *action* upon the agreement; but the whole *defense* of the defendant is based thereon, and without it he was, as before stated, a naked bailee of the bonds, and had no ownership or interest therein, or right to retain the same adversely or in hostility to the demand of the plaintiff. It is the only foundation on which he claims to hold them, and in principle the case is the same as if the defendant was seeking by action to foreclose the plaintiff's right thereto, and bar him from all interest

therein, or claim thereto, and upon the judge's own hypothesis there is "force in the objection." Nor is the position that the agreement was "fully executed," and that the plaintiff has "voluntarily performed" it, warranted by the facts. The agreement under which the bonds were deposited, and necessarily including the terms and conditions of the deposit, was entirely executory in its nature and character. It was substantially to the effect that the persons enlisted would not desert the service before reaching the rendezvous, and in default thereof that the bonds, to the amount of $550 for each man deserting, should be forfeited. The plaintiff has done nothing more than to *make* the agreement. He has not since or subsequent to making it, in any manner performed any act or consented to or acquiesced in anything whatever by which he has relinquished his ownership of the bonds, or any of them, or a right to a return thereof. If he had, *after the desertion* of the men, or any of them, made a settlement or arrangement with the defendant, by which he gave up the bonds or any of them, then there would be ground for holding that he had voluntarily performed the agreement, and that it had been executed to that extent, and he could not afterward set up the invalidity of the contract, originally or in its inception, for the purpose of recovering back those he had so given up.

The views above expressed show that the defendant has failed to establish a right to detain the bonds in question, and, consequently, it is unnecessary to consider the other questions discussed with great ability by counsel on the argument.

It follows that the order appealed from must be affirmed with costs, and judgment absolute must, under the defendant's stipulation, be entered against him with costs.

EARL, C. The defendant was provost marshal of the twenty-first congressional district of the State of New York, and in January, 1865, was engaged in enlisting and mustering men into the military service of the United States, under the call of the president, of December, 1864. Richardson

was engaged in furnishing men to fill the quotas of certain towns; and the defendant, as such provost marshal, before he would enlist and muster in the men, required of him the deposit of the bonds, as security that the men presented by him, then and thereafter, and mustered into the military service of the United States, would not desert the service before reaching the rendezvous.

It is claimed by the plaintiff that this pledge of the bonds was taken by the defendant *colore officii*, and hence was illegal and void, and this is the first question which I will consider.

Section 1 of the act of congress, passed March 3, 1863 (12 Laws U. S., 1863, 731), provided that "all able-bodied male citizens of the United States, and persons of foreign birth who shall have declared, on oath, their intention to become citizens, under and in pursuance of the laws thereof, between the ages of twenty and forty-five years, except as hereinafter excepted, are hereby declared to constitute the national forces, and shall be liable to perform military duty in the service of the United States, when called out by the President for that purpose;" and by section 2 of the same act the persons between the specified ages, exempted from military duty, were those who were "physically or mentally unfit for service." By the same act it was provided that a provost marshal should be appointed for each congressional district, with the rank and pay of a captain of cavalry, whose duty it was to arrest deserters and spies and to discharge other duties mentioned in the act. By this and subsequent acts provision was made for the enrollment of the national forces and for drafts; and when the president called for forces and ordered a draft, it was provided that each town should receive credit for all enlistments made on behalf or to the credit of the town for the purpose of filling its quota. The provost marshal was, for each congressional district, an enrolling, enlisting and mustering officer, and also had charge of the drafting of men when a draft was ordered.

It appears that the President, by proclamation issued on

the 19th day of December, 1864, had called for more of the national forces, and that certain towns in Oneida county were endeavoring, through Richardson, to fill their quotas, under the call, by the enlistment of men. What then was the duty of the defendant as provost marshal? When the men were presented to him for enlistment, it was his duty to examine them, and if he found them of suitable age and "not physically or mentally unfit for the service," to enlist and muster them into the service and send them to the rendezvous. If he found them qualified as above, he had no discretion to exercise; it was his imperative duty to enlist them. The men were a part of the national forces, and had the right to enlist into the military service of their country from patriotic motives or from mercenary motives for the pay they would get, or to escape an impending draft; and the defendant had no right to exclude them. The towns had the right to fill their quotas by enlistment; and when qualified men were thus presented, the defendant was bound to take them. He had no right to inquire into the moral character of the men, or their moral or physical courage, and reject them because he thought they would desert or run in the face of the enemy. It would be only more reprehensible in degree if he had exacted a bond that they would be true and good soldiers during the entire term of their enlistment. Will it be claimed that he could legally have done this? The obedience and duty of soldiers are not secured in this way, and the government has ample power usually to keep its soldiers after they have enlisted, and to apprehend and punish them when they desert.

In this view of the case, this pledge was illegally exacted and was void as taken *colore officii*. But the result must be the same if we assume that the provost marshal had a discretion whether he would take these men or not for the reason alleged by him. If it was his duty to reject men because he believed they would desert, then he should not have been influenced to take them by any pledge. If he had a discretion to take them or not, then he should have exer-

cised his discretion under his oath of office in view of all the circumstances, uninfluenced by the security which he exacted. After these men were enlisted, it was his duty to use all the means at his command to procure their delivery at the rendezvous. If he suspected that they intended to desert, he should have been the more careful and vigilant. How did taking the pledge have any tendency to prevent desertion? It does not appear that these men had any interest in the bonds pledged, or that they were in any way the particular friends or dependants of Richardson; and after they were enlisted he could have nothing more to do with them, as they were then exclusively under the control of the military officers of the government. So far as I can perceive, the only effect the pledge could have was to make the defendant less vigilant in discharging his duty and guarding the men. If he had any faith whatever in the pledge as a security that the men would not desert, its obvious tendency was to cause him to rely somewhat upon it, and not so much upon his zeal and vigilance in the use of other appropriate means. The pledge in fact seems to have had no effect upon the fidelity of the men, as most of them deserted. Hence, in this view of the case, this pledge must be considered as against public policy, and as taken by the defendant *colore officii.*

I have reached this conclusion without considering the fact that the defendant exacted the pledge, not only for such men as Richardson then presented for enlistment, but also for such men as he might thereafter present. If the defendant could exact the pledge because he was satisfied, from his examination, that the men then presented intended to desert, what right had he to exact it for men of whom he knew nothing, and who might be the most faithful and patriotic men in the army? This was an arbitrary exaction not authorized by law nor consonant with public policy; and the contract of security thus exacted is condemned by every authority relating to the subject that can be found in the books.

It is claimed, however, by the learned counsel for the appellant, that a security cannot be condemned as taken by

a public officer, *colore officii*, unless it was corruptly taken, taken with a corrupt and illegal intent, and that it will not be condemned if taken with good motives and for a worthy object; and this makes it necessary to examine briefly the principles upon which these securities are condemned.

In *Dole* v. *Bull* (2 John. Cas., 239), it was held that a bond taken by a sheriff for the ease and convenience of a prisoner in execution, so that he might go at large within the walls of the prison, and conditioned that he should remain a true and faithful prisoner, was not a bond for ease and favor, nor void though not taken in the manner directed by the act relative to jail liberties. The decision was put upon the ground that as the sheriff had the right, without violating his duty, to let the prisoner go at large within the walls of the prison, it was not inconsistent with his duty to take such a bond. The court says: "A distinction is taken between bonds conditioned to remain a faithful prisoner, which are lawful, and bonds to save the sheriff himself against escapes, which are held to be illegal and void. The reason appears to be, that the former are consistent with the duty of the sheriff safely to keep his prisoner, and the latter imply the consent of the sheriff to the prisoner's escape as the alternative of an indemnity for the consequences." This is far from an authority that a public officer may legally exact a bond before he will perform a plain duty, or that he may exact a bond that tends to a lax performance of duty. In *Love* v. *Palmer* (7 John., 160), the action was by an under-sheriff upon a bond conditioned to indemnify him against all costs and damages that should arise against him on account of his not taking N. Palmer to prison, on account and by virtue of a *ca. sa.* which he had in his hands, issued out of the Supreme Court, and the defendants bound themselves to pay the debt and costs for which the *ca. sa.* issued, and to indemnify the plaintiff against all costs and damages which should arise from the premises. The plaintiff had the prisoner and *ca. sa.* in his possession when he took the bond, and it was given for the deliverance of the prisoner from custody,

although he was not bailable. The bond was held void, as taken *colore officii*, although it was taken for the precise amount for which the prisoner was arrested, without oppression or evil intent, and from humane motives. It was condemned because the plaintiff took it in violation of the duty imposed upon him by law, and without authority of law. In *The People* v. *Meighan* (1 Hill, 298), a bond, taken by a justice of the peace in a prosecution for bastardy, containing, in addition to the provisions required by law, others imposing further obligations on the obligor, was held to be void as taken *colore officii*. It did not appear that the bond was *exacted* in the *form* in which it was given, or that it was taken oppressively or corruptly. It was simply not authorized by law, and it was condemned. In *Webbers' Executors* v. *Blunt* (19 Wend., 188), it was held that a promise to a sheriff to indemnify him against all damages to which he might be subjected in consequence of discharging from custody a third person whom he had arrested on legal process, was void, as taken *colore officii*, although the sheriff was induced to grant the discharge upon false representations of the promissor that the debt, to enforce the payment of which the process had issued, had been satisfied. Here was no oppression and no corrupt intent; and yet in this case Judge Cowen cites the case of *Dive* v. *Mowingham* (Plowd. Comp., 67), where the action was upon a bond, taken by a sheriff for a previous offence on an execution; and Chief Justice Montague says, "The prisoner not being bailable, the sheriff took the bond unduly, and *colore officii sui*, which is always taken in *malum partem*, and signifies an act badly done under the countenance of an office, and it bears a dissembling visage of duty, and is properly called extortion. Wherefore," he adds, "here, inasmuch as the obligation was made for the deliverance of T. M., who was in the custody of the plaintiff or officer, it cannot be denied but that he took the obligation for his deliverance *colore officii*." Here the learned chief justice was speaking of the manner in which the law characterized the act of taking securities *colore officii*, and he did not mean to say that the officer

must actually have had a corrupt or evil intent; as, in the
very case he was deciding, the officer did not act oppressively
or corruptly, except as he violated his duty. In *Burrall* v.
*Acker* (23 Wend., 606), the chancellor says: "The words
color of office necessarily imply an illegal claim of right or
authority to take the security or to do the act in question,
by virtue of his office, which claim is a mere color or pre-
tence on the part of the officer;" and he quotes from Tomlin's
Law Dictionary, that "color of office is where an act is *evilly*
done by the countenance of an officer; and is always taken
in the worst sense, being grounded upon corruption, to which
the office is as a mere shadow or color." The acts described
by Tomlin are such as are condemned as done by color of
office; but the definition of the term is not broad enough to
include all cases, as there are many cases in the books where
acts done by color of office have been condemned, although
not grounded upon any actual corruption; yet the law may
impute a corrupt character to them as done in violation of
law. In *Webb* v. *Albertson* (4 Barb., 51), it was held that a
bond taken in the names of the commissioners of highways
of a town, for the benefit of the town in its corporate capacity,
and intended to relieve the taxable inhabitants of the town
from the payment of a tax for a public improvement, viz.,
the extension and opening of a public highway, could not
be enforced against the obligors. The decision was put upon
the ground that the commissioners had a plain duty to per-
form and a discretion to exercise in laying out the road,
and that they might be influenced in the discharge of their
duty by the bond. It was conceded that they acted from
honest motives, and yet it was held that they exceeded their
authority in taking the bond, and that their act must be con-
demned as against the general policy of the law. In *Winter* v.
*Kinney* (1 N. Y., 365), it is said that the policy of the law
in declaring void agreements and securities taken by public
officers, *colore officii*, is to guard against official oppression
on the one side, and a lax performance of duty on the other.
Judge WRIGHT, writing the opinion of the court, cites the

definition of color of office given by Tomlin; but the very case he was considering was one where a deputy sheriff arrested the plaintiff, in a civil action, on Saturday evening, and the plaintiff agreed with him that if he would become his bail until Monday morning, he would deposit with him the amount for which he was required to give bail, and in case he failed to surrender himself to the deputy on Monday morning, or settle with the plaintiff in the suit against him, then that the deputy should pay the money over to such plaintiff. He made the deposit, and it was claimed to have been forfeited, and was paid over to the plaintiff in the action. He sued to recover the money back on the ground that it was taken by the deputy *colore officii;* there was no oppression, no evil intent and no corruption, and the deputy seems to have acted from humane motives.

Without citing or examining more cases, I think I may safely say that no case entitled to weight as authority can be found, which decides that a security taken *colore officii* cannot be condemned unless it was taken with an evil or corrupt intent. The acts of public officers in taking such securities are condemned because they are against the general policy of the law. It matters not that the motives of the officer were good and humane if the acts are of such a character as tend, if countenanced, to oppression or a lax performance of official duty. In all cases where contracts are claimed to be void as against public policy, it matters not that any particular contract is free from any taint of actual fraud, oppression or corruption. The laws look to the general tendency of such contracts. The vice is in the very nature of the contract, and it is condemned as belonging to a class which the law will not tolerate. (*Atchesen* v. *Mallen*, 43 N. Y., 147.)

We are reminded, on the part of the appellant, that there is no law of the United States prohibiting the taking of this pledge, and that our statute, as to securities taken *colore officii* (2 R. S., 386, § 59), is not applicable to officers of the United States. This is undoubtedly true, but the statute of our State mostly, if not to it full extent, embodies principles

of the common law, and it is important in this case only as indicating what the public policy is. My conclusion, upon this branch of the case, is based upon principles of public policy as sanctioned by the common law and expounded by the ablest jurists.

It is further claimed that if this contract of pledge was illegal and void for the reasons stated, the parties were in *pari delictu*, and that the contract was so executed that the plaintiff cannot recover; and this claim must be briefly noticed.

No case has been cited in which it has been held that where an officer receives securities or money *colore officii*, the parties are in *pari delictu* ; and none, I apprehend, can be found. On the contrary, there are cases to be found in the books where money extorted by public officers *colore officii* has been permitted to be recovered by the parties paying, as money had and received. In *Winter* v. *Kinney, supra,* where the question was under consideration, it was not intimated that the defendant could hold the money paid him, because the parties were in *pari delictu*. The oppressor and oppressed are never upon a footing of equality. Both the statute and the common-law prohibition are aimed at the public officer, and are intended to regulate his conduct. He is the one, and not the person yielding to his exaction, who is at common law liable to be indicted for extortion. The law points out the offender, and in such a case the parties are not in *pari delictu*. (*Oneida Bank* v. *Ontario Bank*, 21 N. Y., 496 ; *Sackett's Harbor Bank* v. *Codd*, 18 N. Y., 240 ; *Statesburgh* v. *Smith*, 2 Burrows, 924 ; *Clerk* v. *Shee*, Cowp., 200.)

Neither was this an executed contract. These bonds were pledged as a security that the soldiers would not desert. The pledge was by the agreement of the parties, and the law implies that the pledgee may hold the property pledged as security, and that in case of forfeiture, he must, by sale, after notice to the pledgor or by action, foreclose the pledge ; and until that be done, the legal title to the property remains in the pledgor, and the transaction is *in fieri*. If this con-

tract was fully executed, then the pledgee would have nothing more to do except to hold the bonds as his own, and this will not be claimed.

There is another ground upon which the plaintiff's title to these bonds can be upheld. The contract pledging the bonds was without consideration. Richardson was simply an agent for the towns whose quotas he was filling. It does not appear that he was to have any profit whatever from the enlistment of the men, or that he was in any way to be personally benefited by their enlistment. The bonds did not belong to the towns nor to the men enlisted. The defendant parted with nothing on the faith of the pledge, and did nothing which he was not bound by law to do without it. There was no benefit to the pledgor nor harm to the pledgee, and hence there was no consideration.

The defendant had no authority, either in the law, or, so far as appears, in instructions from his superior officers, to take this pledge; and his act has never been ratified by the government. The fact that he notified his superior officer that he had taken it alone, shows no ratification. Besides, he was not the agent of the provost marshal-general, but an agent of the government of the United States; and an act like this, wholly unauthorized by law, could not probably be ratified by any officer of the government. Who, then, shall hold these bonds? The defendant does not claim that he can hold them for his individual benefit. The government has never ratified his unauthorized act, nor, so far as appears, claimed the bonds; and if the plaintiff cannot recover them they will be without an owner.

Two cases were cited in behalf of the defendant, bearing upon this branch of the case, which I will briefly notice. In *Harp* v. *Osgood* (2 Hill, 216), the plaintiff, as agent of Lee, took in his own name an unauthorized security, and it was held that Lee, as principal, could ratify the act of his agent and enforce the security in the name of his agent. As the agent had no personal interest in the security, it was said that it would have been void without the ratification of the

principal, for the want of consideration.  In *State of N. Y. v. City of Buffalo* (2 Hill, 434), the keeper of the State arsenal at Batavia loaned to the city of Buffalo 200 guns belonging to the State, and took a bond that they should be returned when called for.  It was held that this keeper was not a State officer, but the mere agent of the commissary-general, and that while he was wholly unauthorized to make the loan and take the bond, and that thus the city had obtained and used the guns wrongfully, the State could waive the tort, affirm the loan and sue upon the bond for the value of the guns.  Before either of these authorities could have any bearing upon this case, it would have to appear that the government of the United States had, in some way, adopted or ratified the act of the defendant in taking the pledge.

Having thus given this case the careful consideration its importance deserves, I have reached the conclusion that the order of the General Term should be affirmed, and that judgment absolute should be rendered against the defendant, with costs.

All concur.

Judgment accordingly.