## SHEPPEY v. STEVENS.

### (Circuit Court, N. D. New York. March 24, 1910.)

**1. COURTS (§ 372*)—RULES OF DECISION—PUBLIC POLICY.**

Whether a contract is contrary to public policy is a question of general law, not dependent solely on any local statute or usage, so that in determining the question federal courts are not bound by state law, but will exercise their own judgment.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 977–979; Dec. Dig. § 372.*

State laws as rules of decisions in federal courts, see notes to Wilson v. Perrin, 11 C. C. A. 71; Hill v. Hite, 29 C. C. A. 553.]

**2. CONTRACTS (§ 61*)—CONSIDERATION.**

Plaintiff and defendant, expecting to be beneficiaries of the will of B., who had formed an alliance with a number of women of questionable character, and was contemplating marrying one of them, agreed that defendant should look after B.'s spiritual welfare, and that plaintiff should use his best endeavors in breaking up the alliance between B. and the women, in attempting to influence him to cease his relations with them and induce him not to marry the one intended, and that, in consideration thereof, plaintiff and defendant would equalize any legacy received under B.'s will. *Held*, that such agreement, if otherwise valid, was not nudum pactum; the use of plaintiff's best efforts to terminate B.'s relations with the women and to prevent the marriage being a sufficient consideration.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 252, 253; Dec. Dig. § 61.*]

**8. CONTRACTS (§ 111*)—VALIDITY—PUBLIC POLICY—RESTRAINT OF MARRIAGE.**

Such agreement was void as contrary to public policy in restraint of marriage, regardless of the character of the woman B. intended to marry.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 515–520; Dec. Dig. § 111.*]

**4. CONTRACTS (§ 111*)—PUBLIC POLICY—DETERMINATION.**

Whether a contract to prevent marriage is contrary to public policy must be determined by its general tendency at the time it is made, and, if such tendency is opposed to the interests of the public, the contract is void, however good the intent of the parties, and even though no harm has resulted or would result in the particular case.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 515–520; Dec. Dig. § 111.*]

**5. CONTRACTS (§ 71*)—PROBATE OF WILL—CONTRACT NOT TO OPPOSE—CONSIDERATION.**

A contract by which plaintiff agreed not to oppose the probate of a will in consideration of defendant's agreement to pay plaintiff a sum of money was without consideration, in the absence of a showing that plaintiff was related to testator in any degree, or had any right to contest.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 297, 316–324, 327; Dec. Dig. § 71.*]

Action by John V. Sheppey against Ezra H. Stevens. On demurrer to complaint. Sustained.

H. & W. A. Hendrickson (G. M. Palmer, of counsel), for plaintiff. Fowler & Schenck (Henry J. Cookinham, of counsel), for defendant.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

RAY, District Judge. The substance of the complaint is as follows:

(1) In September, 1898, Ezra G. Benedict, a relative of the plaintiff and also of the defendant, formed an alliance with a number of women of questionable character, and had expended and was expending large sums of money on them, and was contemplating marriage with one of them.

(2) In September or October of that year the plaintiff and defendant entered into an agreement whereby the defendant here agreed to look after the spiritual welfare of the said Benedict, and the plaintiff here agreed to use his best endeavors in breaking up the said alliance between said Benedict and said women, and in influencing and attempting to influence said Benedict to cease and discontinue his relations with said women, and, in consideration thereof, the plaintiff and defendant further agreed that, if either of them should receive less than the other under the will of said Benedict, the party receiving the most thereunder would divide the excess so received by him equally with the other.

(3) In compliance with such contract, the plaintiff did what he agreed to do, and fully performed on his part.

(4) November 20, 1902, Benedict died and left a last will and testament wherein and whereby defendant was made sole executor thereof and was given a large legacy determined on the settlement of the estate to be $1,538,244.91, and such sum or legacy was paid over to the defendant, said will having been duly proved and the estate administered.

(5) By said will the plaintiff herein was not remembered as devisee, legatee, or otherwise, and was not entitled to receive, and did not receive, anything thereunder.

(6) Thereafter plaintiff demanded of the defendant the one-half of such sum so received by him as a legacy under the said last will and testament of said Benedict, but the defendant has neglected and refused to pay same, except the sum of $300 paid on account thereof about March, 1903, and there is now due and owing plaintiff from defendant by reason of such facts the sum of $768,822.45.

The fact will be noted that it is not alleged that either the plaintiff or the defendant were of the heirs at law or next of kin to said Benedict and entitled to share in his estate in case of intestacy. There is no allegation that Benedict was imbecile or unable to care for himself or his property.

The defendant insists that these allegations fail to state a cause of action.

(1) That the alleged agreement was void as contrary to public policy, as one to interfere with and prevent a proposed marriage.

(2) That it was an agreement to dispose of or transfer the property of another in which the contracting parties, so far as appears, had no right or interest present or prospective contrary to the will of the testator, and hence void.

(3) That there was no moral or legal, good, or valuable consideration for the agreement.

(4) That the alleged contract was a wagering contract and void.

(5) That the alleged contract was void for indefiniteness and for want of mutuality, and is unconscionable.

. As between themselves, Sheppey and Stevens agreed that they would interfere in the private life and conduct of Benedict, their relative. It may be assumed that they had an interest in the good name of Benedict, as his disgrace would to some extent affect all his relatives. It cannot be assumed they or either of them had any actual pecuniary interest, present or prospective, in his conduct or expenditures, or use of his money, as there is no allegation to that effect. The one was to look after his spiritual welfare while the other was to use his best efforts to break up existing alliances between Benedict and "women of questionable character," one of whom he contemplated marrying. He had expended money on such women, and was then expending money on them. But it was his own money and he had the right to expend it as he pleased, so far as the plaintiff and defendant and the public were concerned, provided he violated no law.

Was Benedict's conduct and the control of it by his relatives the subject-matter of a valid contract or agreement by and between such relatives? If the conduct and associations of A. are such that they tend to bring disgrace on B., a relative of A., and B. agrees with C. that C. shall do all he can and use his best efforts to break up such associations and cause such conduct to cease, and that he will, in consideration of such efforts and expenditure of time and thought, pay C. the sum of $5,000, and there is a time limit for performance, and C. fully performs on his part, can there be any doubt that C. may recover the consideration agreed to be paid? I think not. It is not necessary that the promisor in such a case receive an actual benefit by way of the success of the efforts of C. It is all-sufficient that he has had the benefit of the efforts of C. in a matter which interested him, B. True, B. had no legal or moral duty to interfere with the movements or associations of A. as between himself and A., or as between A. and the public, but it is all-sufficient that he had an interest in the conduct and associations of A., and that his interference in the way mentioned was not immoral, or illegal, or in any way forbidden by law or a sound public policy. But it is said that another element enters into this contract, viz., an agreement on the part of Sheppey, the plaintiff, to use his best efforts to prevent the marriage of Benedict to a woman "of questionable character," and that the law favors marriage and makes no distinction between marriage to or with a woman of good character and marriage to or with one of "questionable character"; that, in either case, a contract for services to be performed in preventing a marriage and for which a compensation is agreed to be paid is illegal as opposed to a sound, public policy, and therefore not enforceable; that this would be true in case such efforts were expended pursuant to the contract and met with full success. A contract to pay money for procuring a marriage is void, and the payment cannot be enforced. Marshall v. Baltimore, etc., R. Co., 16 How. 314, 333, 14 L. Ed. 953.

. Conditions "in general restraint of marriage" are void "as contrary to public policy and the common weal and good order of society," said Andrews, Ch. J., in Hogan v. Curtin, 88 N. Y. 162, 170, 171, 42 Am. Rep. 244. In Conrad v. Williams, 6 Hill (N. Y.) 444, 451, the defendant promised the plaintiff he would "marry her if he ever married,"

and the court held the contract void as in restraint of marriage, and that an action for its breach could not be maintained.

The proposition is that relatives should not be at liberty to contract to prevent the marriage of one whose marriage to a particular person may be distasteful, or, in their opinion, may disgrace the family or relatives, or deprive those making the agreement of a possible share in the property of the prospective bride or bridegroom, as the case may be. The law ought not, it is urged, to encourage, or recognize, or enforce such contracts. In Lowe v. Peers, 4 Burr, 2225, a man agreed to pay a woman a certain sum of money if he married any one but her, and the agreement was held void. Here the plaintiff contracted with the defendant that he, the plaintiff, would use his best endeavors or efforts to break up the alliance between Benedict and the women mentioned, with one of whom he contemplated marriage, and use his best endeavors to induce Benedict to cease and discontinue his relations with said women. This, of course, included the one he contemplated marrying, and the result of such endeavors, if successful, would have been to prevent a marriage of Benedict with said woman.

Other cases to the effect stated are Bostick v. Blades, 59 Md. 231, 43 Am. Rep. 548; Waters v. Tazewell, 9 Md. 291; Sterling v. Sinnickson, 5 N. J. Law, 756; Chalifant v. Payton, 91 Ind. 202, 46 Am. Rep. 586; Maddox v. Maddox, 11 Grat. (Va.) 804. Here, however, the contract itself was not in restraint of marriage, not to marry, or to marry on conditions only, but, in effect, that Sheppey would use his best endeavors to prevent the contemplated marriage of a third person, Benedict. In short, Sheppey, for a consideration to be paid by Stevens, which was to come out of the estate left by Benedict if paid at all, agreed to use his best endeavors to prevent Benedict from marrying the woman he had in view. It was an agreement by him to prevent, if he could, a contemplated marriage. Its execution was intended to be, and was necessarily, in restraint of marriage. Can the law sanction such contracts by outside parties; that is, by persons other than the ones contemplating, or who might contemplate marriage? If it recognizes and enforces such contracts, then they are encouraged, and the law has lent its sanction to contracts for all sorts of "endeavors" short of illegal acts by outside parties and by relatives and friends to break up and prevent contemplated marriages. Jealousy, hatred, malice, and interest will induce the hiring of the dissolute, or the irresponsible, or the evil-disposed, to use their "best endeavors" to break up contemplated marriages, and such "endeavors" might consist of slander and many other illegitimate practices injurious and detrimental to the well-being of the community and of the public generally. In 9 Cyc. 518, the rule is stated in this language:

"Restrictions on marriage are contrary to public policy, and therefore agreements or conditions creating or involving such restrictions are illegal and void."

Here Sheppey was to use "his best," most strenuous, "endeavors" to break up the alliance of Benedict with these women, and to cease and discontinue his relations with them, which included his contemplated marriage, and the means to be resorted to were left to the discretion of

Sheppey. At the same time, Stevens was to practice upon the moral and religious nature of Benedict, possibly to the same end. If both were remembered in Benedict's will and to an equal amount, no compensation was involved or to be paid. If, however, one was remembered with a devise or a legacy and the other not, the one remembered was to share equally with the other. If both were remembered but unequally, then the legacies were to be added together and the sum total equally divided. The defendant says this was a wager contract and void as against public policy. Each was to operate on Benedict directly or indirectly to change his conduct, and, if possible, preserve his property in his hands unimpaired until death. If either was left anything by his will, or if both were left something, they were to share the total value of such legacies or devises equally. There was no certainty that either would be remembered in the will, if one was made. One might be, the other not. Each, in entering into the agreement, in expending time and effort, took his chances as to compensation on the possibility of a remembrance of one or both in Benedict's will. "A gambling contract or wager is a contract by which two parties, or more, agree that a certain sum of money or other thing shall be paid or delivered to one of them on the happening or not happening of an uncertain event." Bouvier, Law Dictionary.

But is it a wager or gambling contract for one person to render service for another party at his request on a contract that he shall be compensated at a certain sum if an uncertain event happens, but go uncompensated if that uncertain event does not happen or occur? If a person under any guise agrees to pay another 10 or 20 cents per bushel increase over the present market price for wheat in case it goes to $1.30 per bushel in the market, no delivery of wheat under the contract being contemplated, it is a wager contract pure and simple; but, if he employs another to purchase wheat for him at a certain price and agrees to pay $1 per day for the service out of the increased price or profits on a sale thereof, but nothing in case the wheat does not go up in price, we have no wager contract, but a joint adventure in which the laborer takes his chances as to compensation. A lawyer takes a case and agrees with the client that as attorney he shall have 10 per cent. of the recovery, in case there is one, as his compensation for services, and nothing in case there is no recovery—is this a wager contract? Here the agreement was that each of the parties should do certain things for the benefit of the other. Compensation or no compensation depended on the happening or not happening of something in the future, the happening of which was uncertain. Was this in the nature of a gambling transaction? If so, the law will not tolerate it. Clews v. Jamieson, 182 U. S. 461, 490, 21 Sup. Ct. 845, 45 L. Ed. 1183.

Stevens was to pay for the service if he received more under the will of Benedict than did Sheppey. If he did not, he was to pay nothing. However, if the thing Sheppey was to do, the service he was to perform, was illegal as contrary to a sound public policy, he cannot recover for the doing of such act or the rendering of such service. It is not the case of an obligation incurred indirectly connected with an illegal transaction and supported by an independent consideration. In such case the obligation may be enforced. If A. and B. engage in

gambling or any illegal transaction where money is lost by B., and, to pay his loss, B. borrows money of C., and fully informs C. of the transaction and of the use to which the loan is to be devoted, and is devoted, C. may recover the amount of the loan. Armstrong v. American National Bank, 133 U. S. 433, 469, 10 Sup. Ct. 450, 33 L. Ed. 747, and cases cited. Here the money was to be paid by Stevens to Sheppey for using his best endeavors to break up the association of Benedict with certain women of questionable character, and prevent a contemplated marriage of Benedict with one of them. If this contract was not contrary to public policy, and therefore void, Sheppey may recover. It matters not that compensation was contingent on Stevens receiving a legacy or devise under the will of Benedict, providing it was not a cover for a gambling or wager transaction. Sheppey had a perfect right to contract in good faith with Stevens to render him a service, not forbidden by statute or public policy, and agree that his compensation should depend on the happening or nonhappening of an event in the future, the happening of which was uncertain. These parties were at liberty to make a contract for a service to be performed for their mutual benefit, or for the benefit of each, and to contract that each should do certain things, and that the one would pay the other. for his service on the happening of an event the occurrence or happening of which was uncertain, provided the agreement was not a cover for a gambling scheme, and further provided the service performed or to be performed was not forbidden by law or contrary to public policy. They had no right, however, to gamble or wager on the chance of Benedict making a will in favor of one, and not the other, or of both for an unequal amount. It is open to question whether this is a contract such as I have mentioned. It would seem more like a contract to prevent Benedict from marrying and spending his money hoping to gain money by securing a legacy for one or both which legacy or legacies were to be equally divided between them in case of success, and not a contract for services to be performed the one for the other. This feature of the case I do not find it necessary to pass upon.

In Printing, etc., Reg. Co. v. Sampson, L. R. 19 Eq. 462, 465, 44 L. J. Ch. 705, 32 L. T. Rep. N. S. 354, 23 Wkly. Rep. 463, it is said, amongst other things:

"It must not be forgotten that you are not to extend arbitrarily those rules which say that a given contract is void as being against public policy, because, if there is one thing which more than another public policy requires, it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts when entered into freely and voluntarily shall be held sacred and shall be enforced by courts of justice. Therefore you have this paramount public policy to consider—that you are not lightly to interfere with this freedom of contract."

If, then, public policy demands that men of full age and competent understanding shall have the utmost liberty of contracting (for lawful purposes, of course), how can it be consistent with a sound public policy that men may contract to prevent such persons, one or more, from making and performing a lawful contract to marry?

In the federal courts the question whether a contract is contrary to public policy is one of general law, and not dependent solely upon any

local statute or usage, and in determining such question the federal courts will exercise their own judgment. Liverpool, etc., Steam Co. v. Phenix Ins. Co., 129 U. S. 397, 9 Sup. Ct. 469, 32 L. Ed. 788; Bucher v. Cheshin R. Co., 125 U. S. 555, 8 Sup. Ct. 974, 31 L. Ed. 795; Smith v. Alabama, 124 U. S. 465, 8 Sup. Ct. 564, 31 L. Ed. 508; Burgess v. Seligman, 107 U. S. 20, 2 Sup. Ct. 10, 27 L. Ed. 359. When a statute has been passed by a state or by the United States forbidding the doing of a certain thing or act, or the making of a certain contract, the public policy of the state or nation is clear. When a state by its highest court or by a line of uniform decisions in its lower courts has declared a certain act or agreement to be contrary to public policy, the public policy of the state cannot be doubted. However, "in the absence of any legislative prohibition of a particular agreement which may be brought before a court, the latter, to declare it void on this ground, must find that such contracts have a tendency to injure the public, are against the public good, or inconsistent with sound policy and good morals as to the consideration or thing to be done.  *  *  * But there are many things which the law does not expressly prohibit or penalize, but which are so mischievous in their nature and tendency that on grounds of public policy they are not permitted to be the subject of an enforceable agreement."  9 Cyc. 482, 483; West Virginia Trans. Co. v. Ohio River Pipe Line Co., 22 W. Va. 600, 46 Am. Rep. 527. If, then, such contracts as the one in question here have a tendency to injure the public, are against the public good, or inconsistent with sound policy and good morals as to the thing to be done, this contract should be held void and recovery denied. The law favors marriage, and, as stated, denounces agreements or conditions "creating or involving restrictions on marriage." If a contract by A. to marry B., if A. ever marries, is void as contrary to public policy, for the reason it is in restraint of marriage, why is it not opposed to a sound public policy for strangers or relatives to make contracts to break up or defeat, if possible, a proposed or contemplated marriage? It seems to me clear that the execution of such contracts would be demoralizing and mischievous in their tendency, and tend to injure the public. Marriage concerns the whole state. It is regulated by law. The contract of marriage can only be annulled by the state. It is essential to the wellbeing of society and government. If parties may lawfully contract to break up or prevent one proposed marriage, they may lawfully contract to prevent many and all. Who can foresee the number of such agreements that would be made, the number of marriages that would be prevented, the means that would be resorted to, or the social and family disturbances that would result?

In several states an agreement in a divorce action to withdraw and make no defense has been held contrary to public policy and void; the state itself being the third party in interest. Loveren v. Loveren, 106 Cal. 509, 39 Pac. 801; Smutzer v. Stimpson, 9 Colo. App. 326, 48 Pac. 314; Hamilton v. Hamilton, 89 Ill. 349; Sayles v. Sayles, 21 N. H. 312, 53 Am. Dec. 208; Stoutenburg v. Lybrand, 13 Ohio St. 228; Phillips v. Thorp, 10 Or. 494; Kilborn v. Field, 78 Pa. 194. However, Adams v. Adams, 91 N. Y. 381, 43 Am. Rep. 675, is not opposed to this, but consistent therewith.

I am therefore of the opinion that the contract set out in the complaint was void as opposed to public policy, and that the plaintiff cannot recover. It is not validated by the fact that the woman was of questionable character. Sanction such contracts and those seeking to prevent marriages would or might soon make the character of the woman involved questionable, and then make their contract to prevent the marriage. But is it not the privilege of a man free to marry to marry a woman of questionable character? May not her marriage result in her reformation, and so benefit the community and general public? What power but the state is to set itself up as the censor and regulator of the conduct of others and of their selection of a wife? It is immaterial that no injury or detriment to the public resulted from this contract. The validity of such contracts is determined by their general tendency at the time they are made, and, if this general tendency is opposed to the interests of the public, such contracts are invalid, however good the intent of the parties to them, and even though no harm to any one resulted, or would result in the particular case. Richardson v. Crandall, 48 N. Y. 348, 362; Atchesen v. Mallen, 43 N. Y. 147, 3 Am. Rep. 678; McMullen v. Hoffman, 174 U. S. 639, 648, 649;[1] Veazy v. Allen, 173 N. Y. 359, 371, 66 N. E. 103, 62 L. R. A. 362; Fuller v. Dame, 18 Pick. (Mass.) 472; Scofield v. Lake Shore, etc., R. Co., 43 Ohio St. 571, 3 N. E. 907, 54 Am. Rep. 846; Woodstock Iron Co. v. Richmond & Danville Extension Co., 129 U. S. 643, 658, 661, 9 Sup. Ct. 402, 32 L. Ed. 819.

In Richardson v. Crandall, supra, at page 362 of 48 N. Y., the court said:

"It matters not that the motives of the officer were good and humane, if the acts are of such a character as tend, if countenanced, to oppression or a lax performance of official duty. In all cases where contracts are claimed to be void as against public policy, it matters not that any particular contract is free from any taint of actual fraud, oppression or corruption. The laws look to the general tendency of such contracts. The vice is in the very nature of the contract, and it is condemned as belonging to a class which the law will not tolerate. Atchesen v. Mallen, 43 N. Y. 147."

This was quoted and approved in McMullen v. Hoffman, supra.

In Woodstock Iron Co. v. Richmond, etc., supra, the court, at page 658 of 129 U. S., at page 407 of 9 Sup. Ct. (32 L. Ed. 819), said:

"It was adjudged that the contract was contrary to public policy, and that the note given in consideration of it was therefore void. In coming to this conclusion, the court considered somewhat at large the ground upon which contracts of this character were avoided, and held that it was because they tended to place one under wrong influences by offering him a temptation to do that which might injuriously affect the rights and interests of third persons, and that the case before it was within the operation of this principle, the contract tending injuriously to affect the public interest in establishing the fittest and most suitable location for the termination of the Boston & Worcester Railroad for the accommodation of the public travel."

And at page 661 of 129 U. S., at page 408 of 9 Sup. Ct. (32 L. Ed. 819), the court quoted and approved the following from Bestor v. Wathen, 60 Ill. 138:

"In this particular case no wrong may have been done, and yet public policy plainly forbids the sanction of such contracts because of the great temptation they would offer to official faithlessness and corruption."

[1] 19 Sup. Ct. 839, 43 L. Ed. 1117.

It is all-sufficient to condemn the contract that the general tendency and result of the execution of the agreement is to injure the public interests.

And it is immaterial that the whole force and tenor and object of the agreement was not to restrain marriage, but included the rescue of Benedict from his associations with women of questionable character and his temptation to spend or waste his money on them. The laudable and not illegal part of the agreement, assuming a part of it to be laudable, cannot be separated from the illegal part and the latter excluded or eliminated and the agreement upheld and enforced on the validity of the remaining portions. The court cannot remake the agreement. The consideration to be paid was entire, and it is impossible to tell what induced the contract and the promise to pay, or how much, if anything, was intended as compensation for breaking up the prospective marriage, and how much for the endeavors. Haynes v. Rudd, 102 N. Y. 372, 7 N. E. 287, 55 Am. Rep. 815; Foley v. Speir, 100 N. Y. 552, 3 N. E. 477; Bishop v. Palmer, 146 Mass. 469, 16 N. E. 299, 4 Am. St. Rep. 339; Taylor v. Jaques, 106 Mass. 291; Meguire v. Corwine, 101 U. S. 108, 112, 25 L. Ed. 899; Trist v. Child, 21 Wall. 441, 22 L. Ed. 623.

In Trist v. Child, 21 Wall. 441, 22 L. Ed. 623, the court said, speaking of a claim for services honestly rendered and other services which were illegal rendered under the same agreement:

"But they are blended and confused with those which are forbidden. The whole is a unit and indivisible. That which is bad destroys that which is good and they perish together."

This was quoted and approved in Meguire v. Corwine, 101 U. S., at page 112, 25 L. Ed. 899. These considerations lead to the conclusion that the demurrer to the first cause of action set out in the complaint must be sustained on the ground that the agreement was contrary or opposed to public policy and therefore void.

As to the second cause of action, it is to recover upon an agreement of defendant to pay money to plaintiff, a sum specified, in consideration that plaintiff would not contest the proof and probate of the last will of said Benedict. The allegations are that such agreement was made, and that, because of such agreement and relying thereon, the plaintiff did not contest the will, but allowed it to go to probate. The defect of this alleged cause of action lies in the fact that it does not allege that the plaintiff had any interest or right to contest the probate of such last will and testament. In this count of the complaint there is no reference to the allegations of the first count, so that it does not appear that the plaintiff was related in any degree to the testator, Benedict. There is no allegation in the second count that plaintiff was related to the testator, and hence, so far as appears, he had neither interest nor right to contest the probate of the will. Hence we have a mere naked agreement without consideration to support it. There was no surrender or abandonment of a right. Those who would share in an estate of a decedent in case of intestacy may contest the probate of a will, and it is a valuable right. The surrender or abandonment of this right after it has accrued at the request of another to-

avoid expense and litigation on the promise of that other to pay a sum of money furnishes an adequate and legal consideration for the promise to pay and will support the agreement. Such agreements, if free from fraud and undue influence, when performed by the one who is to surrender the right, may be enforced, and are not contrary to public policy. But it must appear that the right to contest existed, and that it was surrendered or abandoned at the request of the one making the promise to pay the money.

Because of this defect in the allegations of the second cause of action, the demurrer to the second cause of action is also sustained.

The plaintiff may file and serve an amended complaint, as he shall be advised within 20 days, on payment of the costs of the demurrer as taxed by the clerk.