SAMPLINER v. MOTION PICTURE PATENTS CO. et al.

(Circuit Court of Appeals, Second Circuit. December 11, 1918.)

No. 13.

1. TRIAL ⚖➙177—EFFECT OF MOTIONS BY BOTH PARTIES FOR DIRECTION OF VERDICT—FINDING OF FACTS.

Motions by both parties for a directed verdict are equivalent to a request for a finding of facts by the court, and both are concluded on the facts so found by direction of a verdict for one of them.

2. CHAMPERTY AND MAINTENANCE ⚖➙6(1)—PURCHASE OF CLAIM BY ATTORNEY FROM CLIENT.

A purchase by an attorney from his client of a right of action for tort, with intent to sue thereon, is champertous and void, and the purchaser cannot maintain an action on the assigned cause of action.

3. CONTRACTS ⚖➙108(1)—LEGALITY—PUBLIC POLICY.

The question whether a contract is void, as contrary to public policy, is to be determined by its general tendency, and if that is opposed to the interests of the public the contract is void, even though in the particular case the intent of the parties may have been good, and no injury to the public may have resulted.

4. CHAMPERTY AND MAINTENANCE ⚖➙1—TERMS DISTINGUISHED.

In "maintenance" no personal profit is expected or stipulated, the motive being simply to aid a party, with money or otherwise, to prosecute or defend his suit; while in "champerty" there is a bargain with the

⚖➙For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

plaintiff or defendant by which the champertor is to carry on the suit at his own expense, and is to derive some profit out of the thing sued for, if he prevails.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Champerty; Maintenance.]

In Error to the District Court of the United States for the Southern District of New York.

Action at law by Joseph H. Sampliner against the Motion Picture Patents Company and others. Judgment for defendants, and plaintiff brings error. Affirmed.

For opinion below, see 243 Fed. 277. Rehearing denied 257 Fed. ——, —— C. C. A. ——.

The action is brought by the plaintiff as assignee of the Lake Shore Film & Supply Company (hereinafter called the Lake Shore Company) under the Sherman Anti-Trust Act (Act July 2, 1890, c. 647, 26 Stat. 209 [Comp. St. §§ 8820–8823, 8827–8830]), to recover treble damages for injuries alleged to have been sustained by the business and property of the Lake Shore Company. The plaintiff is a citizen of the state of Ohio, and is and has been for the last 25 years an attorney at law practicing in the courts of that state.

The Lake Shore Company is a corporation organized under the laws of the state of Ohio, having its principal place of business in the city of Cleveland. Since its incorporation it has been engaged in the business of dealing in positive motion picture films or subjects, and also in projecting machines and appliances, used, sold, and leased in connection with motion picture exhibitions.

The bill of complaint is long and complicated, and occupies 60 printed pages of the record. It narrates the various steps taken by the defendants in their alleged attempt to drive the Lake Shore Company out of business, and to ruin and destroy its good will and its assets. It is alleged that because of this conspiracy it became necessary for the Lake Shore Company to employ legal assistance and that it became obligated to pay $5,000. On December 28, 1911, the Lake Shore Company assigned to the plaintiff all of its right, title, and interest in any and all of its claims for damages against the defendants, or any of them, by reason of their acts and conduct.

The plaintiff sues as an assignee of the Lake Shore Company to recover $750,000, alleging that the company had been injured in its business up to December 28, 1911, to the extent of $250,000, and that by reason thereof he is entitled under the Sherman Anti-Trust Act of July 2, 1890, and the Act of Congress of Oct. 15, 1914 (38 Stat. 730, c. 323), amendatory thereof, to treble damages, making the sum of $750,000.

The defendants in their answer set up two affirmative defenses—the statute of limitations and champerty. As respects the latter it "alleges, upon information and belief, that at the time of said alleged purchase, it was, and is now, the law of the state of Ohio that an attorney who purchased a demand with full knowledge and notice that the same was contested and would be litigated, and with the intent and for the purpose of bringing an action thereon, was guilty of maintenance and champerty, and got no title to such demand by such purchase which could be enforced either at law or in equity, and that the same was at said time, and still is, the law of the state of New York; alleges, upon information and belief, that the plaintiff purchased the demand set forth in the complaint with full knowledge and notice that the same was contested and would be litigated, and with the intent and for the purpose of bringing action thereon."

On May 22, 1917, an order was entered granting a separate trial on the issue of champerty, and providing that, if the judgment of the court or the verdict of the jury on that issue should be in favor of the plaintiff, the trial of the other issues should be set for the June or October term. The case came on for trial on the issue of champerty on May 29, 1917. Testimony was taken on behalf of the plaintiff, and at the conclusion thereof the defendants moved for the direction of a verdict, on the ground that the agreement under which the plaintiff brought his action is champertous and void. The plaintiff

also asked for a direction of a verdict. The court directed a verdict for the defendant. Judgment was entered accordingly on July 12, 1917, which was in certain particulars amended on September 5, 1917.

The plaintiff brings the case here on writ of error. He assigns 63 errors, and the assignment of errors covers 104 printed pages of the record.

Rogers & Rogers, of New York City (Gustavus A. Rogers and Saul E. Rogers, both of New York City, John G. White, of Cleveland, Ohio, and C. A. Neff, Joseph Walker Magrauth, and Nathan Frankel, all of New York City, of counsel), for plaintiff in error.

Seabury, Massey & Lowe, of New York City (Samuel Seabury, William M. Seabury, and Frank de R. Storey, all of New York City, of counsel), for defendants in error Smith and Vitagraph Co. of America.

George F. Scull, of New York City (Robert H. McCarter, of Newark, N. J., of counsel), for defendants in error Thomas A. Edison, Inc., Dyer, and Pelzer.

Coudert Bros., of New York City (Samuel Seabury and Charles B. Samuels, both of New York City, of counsel), for defendants in error Berst and Pathe Frères.

Charles F. Kingsley, of New York City, for defendants in error Motion Picture Patents Co., Kennedy, Marvin, and Biograph Co.

Gifford, Hobbs & Beard, of New York City (Alfred P. W. Seaman, of New York City, of counsel), for defendant in error Kalem Co., Inc.

Dwight McDonald, of New York City, for defendant in error Waters.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). The only question it is necessary for us to consider is whether the assignment of December 28, 1911, is champertous and void. If it is void, the plaintiff cannot maintain his action. If it is not void, the judgment must be reversed. The assignment states that—

"For value received the Lake Shore * * * Company * * * hereby sells, assigns, and transfers to J. H. Sampliner all of its rights and interests in and to any and all damages which it has sustained and suffered by reason of injury to its business, because of the unlawful combination and monopoly in restraint of interstate commerce, and in violation of the Sherman Anti-Trust Act, brought about, engaged in and as a result of the unlawful agreement by and between the Motion Picture Patents Company; * * * all of said parties having conspired together for the purpose of ruining and destroying the business of the Lake Shore * * * Company, and contrary to and in violation of the Sherman Anti-trust Act. * * *"

The testimony shows that the plaintiff had rendered legal services to the assignor as its general counsel in connection with the difficulties in which it found itself with the defendants, and that those services extended over a period from July, 1910, to December, 1911. The plaintiff regarded the reasonable value of his services as worth from $8,000 to $10,000. On December 10, 1911, he was asked by the president of the Lake Shore Company whether he would be willing to bring suit against the defendants, and that he replied that he would bring

the suit, being satisfied that the company had a valid claim, and that it would cost from $8,000 to $10,000. He was informed by the president of the company that it had been losing money very heavily, and it was absolutely impossible for it to undertake any litigation of that kind. He was asked what the company already owed him, and replied in the neighborhood of $9,000 or $10,000. He was told the company did not have the money and could not pay him, and thereupon he said that, if the company would pay him $5,000 in cash, he would cancel the indebtedness. After some reflection the president, Mr. Mandelbaum, told him that the corporation would transfer to him all rights it had against the defendants, if he would be willing to accept it as a satisfaction of the company's indebtedness to him. The plaintiff told him that he would think it over and give him an answer. After a few days' reflection the plaintiff expressed a willingness to accept the assignment, and was told that the board of directors wanted to know whether, if they made the assignment, the plaintiff would as a part of the consideration defend the company and its officers in case any suit was brought against them in matters growing out of their difficulties with the defendants. He agreed to do this, and the assignment was executed.

It appears, therefore, that the assignment originated, not with the plaintiff, but with the Lake Shore Company, and that the consideration for the agreement involved the payment of a past indebtedness, as well as for future services of a professional character. It is also to be noted that the invalidity of the assignment is set up, not by the client, the assignor, who has at no time sought to repudiate it, but by third parties, between whom and the plaintiff no fiduciary relations have existed.

At common law no right of action, whether a right in rem or a right in personam, whether it arose ex contractu or ex delicto, was assignable. Lord Coke wrongly attributed the rule to the doctrine of maintenance and the aversion to the "multiplying of contentions and suits." Lampets' Case, 10 Rep. 48a. The rule is older than the doctrine of maintenance in English law. As Professor Ames, in his Lectures on Legal History, 211, 212, pointed out, the reason for the rule is in the fact that a chose in action always presupposes a personal relation between two individuals and that personal relation cannot be assigned. And see Pollock on Contracts (5th Ed.) 206; Holmes, Common Law, 340, 341; 2 Spence, Eq. Jur. 850. But the courts of equity always recognized the assignment of choses in action, and in England and in this country generally statutes have been passed which have modified the rule that choses in action are not assignable at law. So that now rights of action arising ex contractu and those arising ex delicto, but not for personal torts, are assignable. The right of action which the Lake Shore Company claimed to have for the damages it sustained by reason of the tortious acts of the defendants was assignable. In United Copper Securities Co. v. Amalgamated Copper Co., 232 Fed. 574, 577, 146 C. C. A. 532, this court held that a right of action for property injuries based on a violation of the Sherman Act, and brought under section 7 for treble damages, is assignable.

But, assuming that the right is assignable, was there anything in the relations existing between the Lake Shore Company and the plaintiff which made it nonassignable as between them. It appears that a suit was brought in the District Court of the United States for the Northern District of Ohio to restrain the prosecution of any action based upon the assignment, it being claimed that the cause of action was nonassignable, and that relief was refused on the ground that if it were nonassignable as claimed the defense was as available at law as in equity. This was carried on appeal to the Circuit Court of the Sixth Circuit, which affirmed the court below. General Film Co. v. Sampliner, 252 Fed. 443, —— C. C. A. ——.

While there is a liberty of contract, which in this country is protected by constitutional provisions, yet the right of parties to make contracts may be in a measure restricted by the relations which exist between them as in the case of a trustee and cestui que trust, guardian and ward, parent and child, and attorney and client. The general rule of public policy which discountenances transactions between persons who are situated in a confidential relation towards each other is regarded as applying with particular force to attorneys at law, and they are restricted in dealing with those with whose interests they are intrusted. This is not only because they are officers of the court, but also because of the fiduciary relation in which they stand to their clients and the great influence they exert over their minds. The courts in some cases have gone so far as to say that a gift from a client to his attorney during the continuance of the relation is absolutely void. These cases go, not upon the ground of the inability of the client to make the gift, but upon the inability of the attorney to accept it. Holman v. Loynes, 4 De G., M & G. 270; Morgan v. Minott, 6 Ch. Div. 638; Powell v. Powell (1900) 1 Ch. 243; Greenfield's Estate, 14 Pa. 489, 506. In other cases the gift has not been regarded as void ipso facto, but it has been viewed with the greatest suspicion, and the burden has been placed on the attorney to show the utmost good faith and freedom from all undue influence. Nesbit v. Lockman, 34 N. Y. 167; Bolles v. O'Brien, 63 Fla. 342, 354, 59 South. 133; Whipple v. Barton, 63 N. H. 613, 3 Atl. 922.

The law is well settled that if an attorney purchases any property belonging to his client—not property which is at the time in litigation—the transaction is viewed with suspicion, and he assumes the heavy burden of proving that the transaction is characterized by the utmost fairness and good faith, and not tainted with fraud or undue influence, and that the client acted upon the fullest information and advice. But when he acquires the title to property which is at the time in litigation, or which is about to come into litigation, it is a still more serious matter.

The common law from a very early period made it a crime, designated as common barratry, to induce others to commence even just suits, if done with an oppressive motive, and it punished the offender by fine and imprisonment. And by St. 12 Geo. I, c. 29, it was enacted that if any one who was convicted of common barratry practiced as an attorney or solicitor in any suit he should be transported

for seven years.  And so the common law also punished as a crime the offense of maintenance, which is described by Blackstone as "an officious intermeddling in a suit that no way belongs to one, by maintaining or assisting either party with money or otherwise to prosecute or defend it."  4 Blackstone, 135.  This he declares is an offense against public justice, as it keeps alive strife and contention, and perverts the remedial process of the law into an engine of oppression. Champerty, a species of maintenance, was also punished by the common law.

"It signifies," Blackstone says, "the purchasing of a suit, or right of suing: a practice so much abhorred by our law that it is one main reason why a chose in action, or thing of which one hath the right, but not the possession, is not assignable at common law, because no man should purchase any pretense to sue in another's right.  These pests of civil society, that are perpetually endeavoring to disturb the repose of their neighbors, and officiously interfering in other men's quarrels, even at the hazard of their own fortunes, were severely animadverted on by the Roman law; 'Qui improbe coeunt in alienam litem, ut quic quid ex condemnatione in rem ipsius redactum fuerit inter eos communicaretur, lege Julia de vi privata tenentur.'  Those who knavishly interfere in other men's suits. for the purpose of sharing whatever may be awarded by the verdict, are liable to the Julian law de vi privata (of secret influence); and they were punished by the forfeiture of a third part of their goods, and perpetual infamy."

In Sherman's Roman Law in the Modern World, vol. 2, p. 456, it is said:

"An agreement with a client that remuneration for conducting his law suit should be a certain portion of the proceeds (pactum de quota litis) was forbidden; an advocate making such an agreement was disbarred.  This Roman prohibition, designed to uphold the honor of the legal profession, has exerted a strong influence in modern law."

And see Mackenzie's Roman Law, p. 446.

[4] In maintenance no personal profit is expected or stipulated. The motive is simply to aid a party, with money or otherwise, to prosecute or defend his suit.  Spicer v. Jarrett, 61 Tenn. (2 Baxt.) 454, 457.  And in champerty there is a bargain with the plaintiff or defendant by which the champertor is to carry on the suit at his own expense and is to derive some profit out of the thing sued for if he prevails.  Roberts v. Cooper, 20 How. 467, 484, 15 L. Ed. 969; Breeden v. Frankford Marine, etc., Insurance Co., 220 Mo. 327, 119 S. W. 576.  And see 11 C. J. 234.  And a champertous agreement is of course void and unenforceable.

In Peck v. Heurich (1897) 167 U. S. 624, 630, 17 Sup. Ct. 927, 929 (42 L. Ed. 302), the Supreme Court declared that—

"According to the common law, as generally recognized in the United States, wherever it has not been modified by statute, and certainly as prevailing in the District of Columbia, an agreement by an attorney at law to prosecute at his own expense a suit to recover land in which he personally has and claims no title or interest, present or contingent, in consideration of receiving a certain proportion of what he may recover, is contrary to public policy, unlawful, and void, as tending to stir up baseless litigation."

The plaintiff contended in this court that, as his assignor was not objecting to the validity of the assignment on the ground of inade-

quacy of consideration, the objection certainly could not be raised by a third party. We may concede that ordinarily the validity of an assignment cannot be attacked by third parties on the ground of inadequacy of consideration. As between an assignor and an assignee, if the inadequacy of the consideration is sufficient to shock the conscience of a chancellor, it may be in some cases sufficient ground for setting a transaction aside. But the wrong in such cases is a private wrong to the assignor, and third parties are without standing to complain. And if assignor and assignee stand in a fiduciary relation there is still no right in third persons to allege the invalidity of the assignment solely on that ground. But the weakness of this contention in this case lies in the fact that the question here is not between the plaintiff and the defendants alone. If it were, the argument advanced might be conclusive. The question is one of public policy, and upon that ground the decision rests.

The plaintiff argued in this court and in the court below that the consideration for the assignment of the Lake Shore Company's cause of action was the extinguishment of a precedent debt due from the assignor and that therefore the assignment was valid and not champertous. If his premise is correct, there is very respectable authority which would support his conclusion. Professor Ames in his Lectures on Legal History, 258, note 1, states that—

"The distinction was established at an early period, that the grant of a power of attorney to a creditor was not maintenance while a similar grant to a purchaser or donee was maintenance. 34 Hen. VI, 30, 15; 37 Hen. VI, 13–3; 15 Hen. VII, 2–3; South v. Marsh (1590) 3 Leon. 234; Harvey v. Beekman (1600) Noy, 52. As late as 1667–1672, the same distinction prevailed also in equity."

In 1 Bacon's Abridg. 360, 361, referring to champerty it is said that—

"A grant of part of a thing in suit, made in consideration of a precedent debt is not within the meaning of the statute, but such only as is made in consideration of maintenance."

And again:

"But neither a conveyance executed, pending a plea, in pursuance of a precedent bargain * * * are within the meaning of the statute."

In 11 C. J. 247, the law is stated as follows:

"A grant or assignment of an interest in the subject-matter of the suit, made by the client to his attorney in consideration of a precedent debt, is not contrary to public policy or champertous. Nor is it made so by a statute which prohibits an attorney from buying a thing in action with intent to bring an action thereon, except in payment for services rendered."

In Tapley v. Coffin, 12 Gray (Mass.) 420 (1859), an attorney and client agreed that the attorney was entitled to $1,240 for past services and that he should have $400 in full satisfaction for future services in certain suits. And in order to secure the payment of these sums the client assigned to the attorney his share in his father's estate then under administration, and it was agreed that the attorney should collect and receive the same and after deducting the necessary ex-

penses and sums of $1,240 and $400 pass over to the client the residue. The court sustained the legality of the agreement and said:

"It does not present a case of champerty or maintenance."

In Jordan v. Gillen, 44 N. H. 424 (1862), the client assigned to his attorney a cause of action sounding in tort, the consideration being the discharge of a precedent debt due from the client to the attorney. The transaction was held to be not invalid and that the attorney would have the right to enforce the claim.

The New York statute laws of 1818 made the purchase of a chose in action by an attorney a ground of defense against a suit upon it, but where it was received bona fide in payment of an antecedent debt it was allowed by a proviso in the statute. See Watson's Executors v. McLaren, 19 Wend. (N. Y.) 557, 565 (1838), affirmed in 26 Wend. (N. Y.) 425, 37 Am. Dec. 260.

[1] But the difficulty with all this is that this court cannot accept the plaintiff's premise and hold that the consideration for this assignment was a precedent debt which was thereby extinguished. At the close of the plaintiff's case in the court below, when counsel for defendants rested and asked for the direction of a verdict, the plaintiff's counsel stated to the court the issue as follows:

"The defense is that this plaintiff's title is void because he purchased this cause of action with the intent to sue thereon. It now appears uncontradicted, from the evidence, that instead of having purchased this cause of action, that it was assigned to him under a bona fide assignment for an antecedent indebtedness owing to him for services which he had performed for the corporation."

This being the issue as the plaintiff's counsel understood it, and which was not controverted by defendants, the plaintiff and defendants each moved for a directed verdict in their favor. There was the plaintiff's testimony which, if the court accepted it, would have justified a finding that the cause of action was assigned for an antecedent indebtedness. There was other testimony from which a court might infer otherwise. No bill had ever been rendered by the plaintiff to the Lake Shore Company for the legal services the plaintiff says he rendered between July, 1908, and December, 1911, and no demand of payment had been at any time made. No entry had been made in the Lake Shore Company's minute book, either of the making of this assignment or of a meeting of the directors at which this assignment was discussed or authorized. No disclosure of this assignment was made to the Mutual Film Company to which, in March, 1912, the Lake Shore Company sold all its assets, notwithstanding the fact that the president of the latter company entered the employ of the Mutual Film Company as general manager at that time, and remained with it in that capacity until March, 1913. The above facts are disclosed by the testimony of the plaintiff's own witnesses. The weight to be given to the testimony and the inferences to be drawn from it were for the court to determine, in view of the request made by each side to direct a verdict in their favor. This was equivalent to a request for a finding of fact and as the court directed the jury to find a verdict for one of them, both are concluded on the facts so found. Beuttell v. Ma-

gone. 157 U. S. 154, 15 Sup. Ct. 566, 39 L. Ed. 654. In the case at bar the trial court said:

"Both sides having moved for a direction of a verdict, I find as a fact that the plaintiff purchased this cause of action with intent to sue thereon."

He accordingly directed a verdict for the defendants.

[2] This court is therefore not at liberty to review the trial court's findings of fact, but is as much concluded as it would be by a verdict of the jury. Lehnen v. Dickson, 148 U. S. 71, 13 Sup. Ct. 481, 37 L. Ed. 373; Runkle v. Burnham, 153 U. S. 216, 14 Sup. Ct. 837, 38 L. Ed. 694. And we must dispose of this case upon the theory that the plaintiff did not in fact take this assignment to extinguish a precedent debt, but that he purchased it for the purpose of suing on it; that he, an attorney at law, purchased from his client for $5,000 a cause of action which he values at $750,000. The question we must answer, therefore, is whether the law sanctions such a transaction between parties standing in the confidential relation of attorney and client. We are satisfied that the common law does not sanction it.

In Tyrrell v. Bank of London, 10 H. L. Cas. 26, 44, Lord Chancellor Westbury used language which this court heartily approves and gladly adopts.

"There is no relation known to society," he said, "of the duties of which it is more incumbent upon a court of justice strictly to require a faithful and honorable observance, than the relation between solicitor and client; and I earnestly hope that this case will be one of the many which vindicate that rule of duty which has always been laid down, namely, that a solicitor shall not, in any way whatever, in respect to the subject of any transactions in the relations between him and his client, make gain to himself at the expense of his client, beyond the amount of the just and fair professional remuneration to which he is entitled."

In 1823 Chief Justice Swift, of Connecticut, published Swift's Digest, a famous work in its time, and in volume 2, p. 57, said that the purchase of a lawsuit by an attorney is champerty in its most odious form. And he added that—

"As a sworn minister of the courts of justice, the attorney ought not to be permitted to avail himself of the knowledge he acquires in his professional character to speculate in lawsuits."

It is said, however, that this assignment was made in Ohio; that the assignor was an Ohio corporation; that the assignee was domiciled in Ohio; that apparently there was at the time no intention of bringing suit on the assignment elsewhere than in Ohio; that whether the lex loci contractus or the lex loci solutionis is to determine the validity of the assignment that law in this case is the law of Ohio. There is no disagreement on either side on this phase of the subject. We have examined the cases in Ohio, and we have been unable to discover that the question which this case presents has been passed upon by the courts of that state, or that there is anything in the statutes of the state or in the decisions of its highest court which should lead us to think that by the law of that state the assignment is valid. The case of Reece v. Kyle, 49 Ohio St. 475, 31 N. E. 747, 16 L. R. A. 723 (1892) is certainly clearly

distinguishable in its facts from the case at bar. The agreement the attorney and client made in that case involved an assignment by the client to the attorney of a judgment obtained by the attorney for the client; it being agreed that the attorney should render legal services in an effort to collect the judgment, and that he would advance costs and expenses involved in the proceeding, one-half of which was to be repaid by the client in case of failure, and in case of success the net proceeds of the judgment were to be equally divided between them. It is apparent that the assignment was for the purpose of security and to provide for the payment of the costs and expenses, including the attorney fees. It does not appear what the proportion was between the consideration advanced by the attorney and the share of the judgment he was to receive as a fee. The agreement was held valid and not champertous. But the opinion of the court clearly indicates we think that it would not have sustained such an agreement as the one now in suit. For the court used the following language:

"The conduct of attorneys is subject to proper scrutiny by the courts. The maintenance of a high character for dignity and integrity on their part, is essential to the security of community, and the due administration of justice. Any infraction of the letter of this statute [the penal statute of February 10, 1824] would entail its penal consequences upon an offending attorney, and the courts would not hesitate to hold void any contract violative of its spirit, whether coming within the strict letter or not. So, too, the courts have been, and continue to be, careful not to sanction contracts which appear to encourage a gambling spirit, one leading to the prosecution of pretended or obsolete claims, for a possible high reward."

In Davy v. Fidelity & Casualty Ins. Co., 78 Ohio St. 256, 85 N. E. 504, 17 L. R. A. (N. S.) 443, 125 Am. St. Rep. 694 (1908), the court held that, while a contract for an attorney's fee contingent on the amount to be recovered is ordinarily valid in that state, still if the contract is such as will prevent the client from settling his claim without the consent of the attorney, it is champertous and voidable at the option of the client, and its illegality will avail in any action against a third party which is based on the contract.

And the courts of Ohio hold that a contract is champertous and void where a client and his attorney agree that the latter may prosecute the suit in his own name and at his own risk and cost, and which deprives the client of the right to control or compromise the suit, and which gives the attorney a contingent fee to be deducted from the proceeds of the suit and is dependent upon the success thereof. Brown v. Ginn, 66 Ohio St. 316, 64 N. E. 123. See Steward v. Welch, 41 Ohio St. 483; Pennsylvania Co. v. Lombardo, 49 Ohio St. 1, 5, 29 N. E. 573, 14 L. R. A. 785; Railroad Co. v. Volkert, 58 Ohio St. 362, 50 N. E. 924.

[3] The question whether an agreement is void on the ground that it is contrary to public policy is to be determined by its general tendency. If that is opposed to the interests of the public, the agreement is void, even though in the particular case the intent of the parties may have been good and no injury to the public may have resulted. Woodstock Iron Co. v. Richmond, etc., Extension Co., 129 U. S. 643, 9 Sup. Ct. 402, 32 L. Ed. 819; Oscanyan v. Winchester Repeat-

ing Arms Co., 103 U. S. 261, 26 L. Ed. 539; Meguire v. Corwine, 101 U. S. 108, 25 L. Ed. 899. As was said by Chief Justice Prentice in Connors v. Connolly, 86 Conn. 641, 656, 86 Atl. 600, 605 (45 L. R. A. [N. S.] 564):

"It matters not that any particular contract is free from any taint of actual fraud, oppression, or corruption. The law looks to the general tendency of such contracts."

See Greenhood on Public Policy, p. 5; Richardson v. Crandall, 48 N. Y. 348. And Mr. Justice Field said in Providence Tool Co. v. Norris, 2 Wall. 45, 17 L. Ed. 868:

"The law looks to the general tendency of such agreements, and it closes the door to temptation, by refusing them recognition in any of the courts of the country."

It is enough that the contract belongs to a class which has a tendency contrary to the public good, although in the particular instance no injury results. Palmbaum v. Magulsky, 217 Mass. 306, 308, 104 N. E. 746, Ann. Cas. 1915D, 799.

The general tendency of such agreements as the attorney and client made in this case is contrary to the public interests. The agreement concerns the administration of justice in the courts, and it is made by an officer of the courts, who undertakes to speculate in his client's suit. The attorney knows much better than his client can possibly know the value of a particular cause of action and the chances as to its successful prosecution in the particular case, and even if there is a full and honest disclosure to the client there are strong reasons which should forbid the purchase. It would be a gross impropriety in a judge to buy a lawsuit. The impropriety may be less in degree, but it is none the less an impropriety for an attorney, who is an officer of the court and a minister of justice, to speculate in the suits of his client. It would tend to impair public confidence in the profession and in the administration of justice itself.

Judgment affirmed.