165 So.2d 106

**Alex LOTT et al.**

**v.**

**Corbin C. KEES and Mary Haynes Kees.**

**I Div. 177.**

Supreme Court of Alabama.

May 28, 1964.

Howell, Johnston & Langford, Mobile, for appellants.

Z. B. Skinner, Jr., Mobile, and J. O. Moss, Lucedale, Miss., for appellees.

PER CURIAM.

This appeal from a final decree of the circuit court of Mobile County, in equity, presents for consideration, under appropriate assignments of error, Aspect C of the bill of complaint, as amended.

This aspect of the suit seeks to have (8) oil, gas and mineral leases executed by appellants (the Lotts) to appellees (the Kees) declared null and void because the only consideration for each of the leases sought to be set aside was a champertous agreement of the lessees (the Kees) to hire a lawyer and pay all expenses of a lawsuit, if necessary, to clear title to the land leased, namely, a vacant lot consisting of about two acres situate in the Town of Citronelle, Alabama, which, if the suit were successful, would clear the lessors' (the Lotts') title to the surface and 1/8th royalty interest in the minerals, and would give to the lessees (the Kees) a clear leasehold interest under each of the mineral leases here involved.

It appears from the pleading and the evidence that the Kees were approached by one Herman Emerson, who introduced them to the Lotts at the home of one of them in Mobile County; that at this meeting a discussion took place with reference to the title of the lot here under consideration. It was agreed that the Lotts, the appellants, would execute and deliver the several mineral leases by the terms of which the Kees were to acquire a leasehold inter-

est in the oil or minerals that might be found under the lot. It further appears that leases followed the usual pattern of royalty division, 7/8ths to the Kees and 1/8th to the lessors (the Lotts). The lease was for a term of ten years "and as long thereafter as oil, gas or other mineral is produced from said land or land with which said land is pooled hereunder."

The lease contains paragraph 1, which reads as follows:

"1. Lessor in consideration of Ten and No/100 ($10.00) Dollars in hand paid, of the royalties herein provided, and of the agreements of Lessee herein contained, hereby grants, leases and lets exclusively unto Lessee for the purpose of investigating, exploring, prospecting, drilling and mining for and producing oil, gas and all other minerals, laying pipe lines, building roads, tanks, power stations, telephone lines and other structures thereon to produce, save, take care of, treat, transport and own said products, and housing its employees, the following described land in Mobile County, Alabama, to-wit: * * *"

The testimony of the Kees was that they did not pay to the lessors the initial rental consideration of $10.00, but did agree to hire a lawyer, if necessary, and otherwise defray all expenses in clearing the title to the lot which was the subject of the lease.

Before the instant suit was filed, the Kees employed an attorney to clear the title; and, also, the Kees themselves spent much time in the probate office at Mobile doing research work in an effort to find record data that affected the title to the property; also, they employed a title company to prepare and furnish an abstract of title. Negotiations were begun with a Dr. Moorer, who had purchased the lot from the State of Alabama, which, in turn, had acquired the property at a sale for state and county taxes. Pending the instant suit filed by appellants (the Lotts), the Kees caused a suit to be filed against Dr. Moorer to clear the title.

Prior negotiations and this suit culminated in an agreement with Dr. Moorer whereby the latter quitclaimed the lot for the benefit of the Lotts. The deed recited a consideration of $2500.00. It appears that other factors entered into the settlement. The title was cleared.

Also, we are impressed from the evidence that the Kees initiated successful exploratory drilling for oil and that the share of the Lotts is being held in escrow for them pending the outcome of this litigation.

The trial court held in its final decree that the several leases were valid and subsisting instruments and denied relief to complainants. Hence, this appeal with appropriate assignments of error addressed to the decree of the court in denying relief under Aspect C of the complaint.

We advert to the doctrine of champerty as it relates to contracts and other transactions between laymen, which is the status of the parties to this suit. We quote from 10 Am.Jur., Champerty and Maintenance, § 14, p. 560, as follows:

"§ 14. Generally.—Contracts between laymen to furnish aid in the prosecution of a suit for a part of the recovery therein were, at one time, regarded as champertous. The modern law is, however, much less rigid in its application, and no very definite rule may be announced, the criterion of public policy being very largely the guide to the decisions. The older cases generally follow the old rule and declare the contracts void per se, while the more recent cases generally adopt the principle that they will carefully scrutinize the contracts to determine their actual purpose, and if in their opinion they are to stir up strife and litigation, to harass or persecute others, to induce the filing of suits otherwise to be forgotten, or to speculate in litigation, the contracts come within the principles of champerty and maintenance and are void. * * *"

We also refer to the case of Brown v. Bigne, 21 Or. 260, 28 P. 11, 14 L.R.A. 745, 28 Am.St.Rep. 752, from which we quote extensively as follows:

"The only question in this case is whether the contract between plaintiff and Bigne is champertous and void. The solution of this question depends upon how far the ancient doctrine of champerty and maintenance is to be recognized in this state

"It is conceded at the outset that the contract in suit was honestly and fairly made, and that Brown acted in entire good faith in the matter. No advantage was sought or taken of Bigne. He was fully informed as to the extent, amount, and value of the property claimed by him, and it was at his earnest solicitation that Brown made the contract. When he was without means or credit to prosecute his claims, and sore pressed by the Manciet heirs, who sought to exclude him from his share in the estate, he applied to Brown for aid in the struggle, who thereupon in good faith entered into the contract, and advanced the money to enable him to prosecute his claim, upon no other security for its repayment than the assignment of a one-half interest in the property in litigation. Under these circumstances, the defense of Bigne may be considered anything but meritorious.

"Under the ancient doctrine of champerty, the contract in suit is clearly void, for that offense was defined to be a bargain with a plaintiff or defendant to divide the land or other matter in suit between them, if they prevailed; whereupon the champertor was to carry on the suit at his own expense. 4 Bl. Comm. 135. Some of the authorities omit from their definition the statement that the champertor is to carry on the suit at his own expense, and confine it simply to an agreement to aid a suit, and then divide the thing recovered. 1 Hawk.P.C. c. 84, § 1; Co.Litt. 368b.

"The doctrine of champerty and maintenance, the gist of which is the same, differing only in the mode of compensation, arose from causes peculiar to the state of society in which it was established. The most potent reason for their suppression was an apprehension that justice itself would be endangered by these practices. The doctrine was established 'to repress the practices of many who, when they thought they had title or right to any land, for the furtherance of their pretended right conveyed their interest, or some part thereof, to great persons, and with their countenance did oppress the possessors. The power of great men, to whom rights of action were transferred in order to obtain support and favor in suits brought to assert these rights, the confederacies which were thus formed, and the oppression which followed from the influence of great men in such cases, are themes of complaint in the early books of the English law.' Slywright v. Pages, 1 Leon. 167.

"Blackstone speaks of these offenses as perverting the process of the law into an engine of oppression. 4 Bl. Comm. 135. So great was the evil of rich and powerful barons buying up claims, and, by means of their exalted and influential positions, overawing the courts, and thus securing unjust and unmerited judgments, and oppressing those against whom their anger was directed, that it became necessary, in an early day in England, to enact statutes to prevent such practices, and to invoke in all its rigor the doctrine against champerty and maintenance. The common-law rule prohibiting the assignment of choses in action, and the sale and transfer of land held adversely, was a branch of this same doctrine, and arose from the same causes.

"Lord Coke says: 'Nothing in action, entry, or re-entry can be granted over, for so, under color thereof, pretended

titles might be granted to great men, whereby right might be trodden down and the weak oppressed.' And BULLER, J., in Masters v. Miller, 4 Term R. 320, says: 'It is laid down in our old books that, for avoiding maintenance, a chose in action cannot be assigned.' But he adds. 'The good sense of that rule seems to me very questionable, and in early as well as modern times it has been so explained away that it remains at most only an objection to the form of the action.' Under the circumstances above indicated, to allow rich and powerful persons to buy up claims, or to assist in the litigation with money to enable the plaintiff or defendant to prosecute or defend his cause of action or defense, was undoubtedly dangerous to the liberty of the subject, and sound public policy forbade it. With the advance of time came the change of circumstances, and in modern times, since England has enjoyed a pure and firm administration of justice, even in that country the rigor of the common law against champerty and maintenance has been very much softened; so that now not only the assignability of choses in action is generally recognized in that country, but it is said there is no rule of law which prohibits the purchase of the subject-matter of a pending lawsuit, although accompanied with an agreement to indemnify the vendor against costs and expenses. Knight v. Bowyer, 2 DeGex & J. 421. Nor is a contract to support a pending litigation, in consideration of having a stipulated part of the money or thing recovered, *per se* void, as against public policy. Coondoo v. Mookerjee, L.R. 2 App.Cas. 186.

"In this country, where no aristocracy or privileged class elevated above the mass of the people has ever existed, and the administration of justice has been alike impartial to all without regard to rank or station, the reason for the ancient doctrine of champerty and maintenance does not exist, and hence has not found favor in the United States. Roberts v. Cooper, 20 How. [U.S.] 467 [15 L.Ed. 969]; Thallhimer v. Brinckerhoff, 3 Cow. [623] 643. In some of the states the whole doctrine is regarded as entirely obsolete. Mathewson v. Fitch, 22 Cal. 86; Bentinck v. Franklin, 38 Tex. 458. But the doctrine, in a more or less modified form, is generally recognized in a great majority of the states of the Union, and contracts which come within the mischief to be guarded against in the administration of justice are held to come within the rule. Lathrop v. [Amherst] Bank, 9 Metc. (Mass.) 489; Gilbert v. Holmes, 64 Ill. 548; Barker v. Barker, 14 Wis. [131] 142; Lafferty v. Jelley, 22 Ind. 471; Holloway v. Lowe, 7 Port. (Ala.) 488; Weakly v. Hall, 13 Ohio, 167; Backus v. Byron, 4 Mich. 535; note to Thallhimer v. Brinckheroff, 15 Amer.Dec. 319.

"To meet the changed condition of society and administration of justice, the rule has been much modified, so that, upon modern construction, the doctrine of champerty and maintenance, as regards a layman, is confined to cases where a man, for the purpose of stirring up strife and litigation, encourages others either to bring actions or to make defenses which they have no right to make, or otherwise would not make; such interference is considered as having a tendency to pervert the course of justice. Dorwin v. Smith, 35 Vt. 69; Findon v. Parker, 11 Mees. & W. 675; Stanley v. Jones, 7 Bing. 369. The gist of the offense consists in the officious intermeddling in another suit, and contracts not within the mischief to be guarded against should not be held to come within the rule.

"It may now be stated as a general rule that a man may sell the whole or part of a thing in action, as well as the whole or part of a thing in possession. The right of disposition is involved in the very idea of property. With few exceptions, not material here, whatever

a man may own he may sell; and whatever a man may lawfully sell another man may lawfully buy. And, whenever a man has bought anything in the nature of property, he is entitled to all the remedies the law may afford, to enable him to possess and enjoy it. It follows that there is now no rule of law which prohibits the purchase of anything otherwise capable of assignment, merely because it may become the subject of a lawsuit. From this it logically follows that the purchase of a right, which is the subject-matter of a pending lawsuit by one standing in no fiduciary relation, is not unlawful, unless it is made for the mere purpose or desire of perpetuating strife and litigation; nor can it make any difference, on principle or authority, that the consideration for the purchase is to be used in conducting the litigation and paying the expenses thereof. A fair *bona fide* agreement, by a layman, to supply funds to carry on a pending suit, in consideration of having a share in the property if recovered, it seems to us, ought not to be regarded as *per se* void, either on the grounds of champerty, as now understood or of public policy. Indeed, it may sometimes be in furtherance of justice and right that a suitor who has a just title to property, and no means except the property itself, should be assisted in that way. The doctrine of champerty is directed against speculation in lawsuits, and to repress the gambling propensity of buying up doubtful claims. It is not, nor never was intended to prevent persons from charging [sic] the subject matter of the suit in order to obtain the means of prosecuting it. 1 Add.Cont. 392; Stotsenburg v. Marks, 79 Ind. 193.

"But agreements of the kind above suggested should be carefully watched and closely scrutinized, when called in question, and if found to have been made, not with a *bona fide* object of assisting a claim believed to be just, but for the purpose of injuring and oppressing others by aiding in unrighteous suits, or for the purpose of gambling in litigation, or to be so extortionate or unconscionable as to be inequitable against the party, effect ought not to be given to them. Courts administering justice according to the broad principles of equity and good conscience, as they are bound to do, will consider whether the transaction is merely the *bona fide* acquisition of an interest in the subject of litigation, or whether it is an unfair or illegitimate transaction gotten up for the purpose merely of spoil or speculation. The doctrine of champerty, to the extent that furnishing aid in a suit under an agreement to divide the thing recovered is *per se* void, we think ought not to prevail, when such aid is furnished by a layman; but when such contracts are made for the purpose of stirring up strife and litigation, harassing others, inducing suits to be begun which otherwise would not be commenced, or for speculation, they come within the analogy and principles of that doctrine, and should not be enforced. Gilbert v. Holmes, 64 Ill. 548; [Propeller] The Mohawk, 8 Wall. 153 [19 L.Ed. 406]; Boardman v. Thompson, 25 Iowa, 487.

"Applying these principles to the case in hand, we find that the contract between plaintiff and defendant was entered into in entire good faith, and with no intention on the part of plaintiff of officiously intermeddling in the controversy between Bigne and the Manciet heirs, but only at Bigne's earnest solicitation, to enable him to obtain means to prosecute his claim. The contract was not unconscionable or unjust, but fairly entered into. Bigne had no means except the property in litigation, and the taking by plaintiff of an assignment of a one-half interest therein, as a consideration for the money advanced by him, violated no principle of law or public policy, so far as we can see from this record.

"What was said by THAYER, J., in relation to the doctrine of champerty, in Dahms v. Sears, 13 Or. 47, 11 Pac.Rep. 891, is in regard to contracts between attorney and client, and has no application here. The relation of attorney and client between Brown and Bigne did not exist, and this opinion is confined to the case before us."

We have carefully read the text of the evidence in the case at bar, from which we conclude that the transaction between the appellants (the Lotts) and the appellees (the Kees) was not infected with champerty or vitiated thereby. The Lotts were colored people, some of whom, if not all, had a very limited education, and were anxious to redeem the lot, if possible, which they inherited from their ancestor, and which had been sold for payment of state and county taxes. We are also impressed that they were without funds to finance the necessary investigations and legal procedure to effect redemption and clear the title. They were dependent on financial aid from some source that was not freely available to them. They were seeking help.

The Kees, who were in the oil and mineral leasing business, agreed to finance the necessary investigation and the initiation of legal procedure to protect the interests of the Lotts and effect title in them.

We further observe that the oil and mineral leases obtained in exchange for this help did not exact benefits to the Kees that were uncommon or foreign to the usual and customary leases obtained in transactions relating to land without title blemishes.

We are impressed from the evidence that the parties entered into the transaction in good faith, and with no intention on the part of the Kees of officious intermeddling in a controversy or with the desire to promote or foster unnecessary litigation. Vaughan v. Marable, 64 Ala. 60(4). The leases which the Kees obtained were not unreasonable or unjust, but provided a fair and equitable participation to all parties concerned. Vaughan v. Marable, 64 Ala. 60, supra.

In view of the fairness of the transaction and the need of the Lotts for immediate financial help in trying to retrieve their otherwise lost property, we do not think the advancement of financial help violated any principle of law or public policy. The Lotts acquired a clear title to the surface of the land, in which the Kees in no wise participated, and, also, an equitable royalty in the minerals. The transaction was not entered into for the purpose of stirring up strife and litigation, or harassing others, but we think in good faith for the purpose of testing the tax title acquired.

The rule of this case does not apply to rights which are not assignable.

As observed in Brown v. Bigne, supra, the relation of attorney and client did not exist, and this opinion is confined to the case before us.

The decree of the trial court is therefore affirmed.

The foregoing opinion was prepared by B. W. Simmons, Supernumerary Circuit Judge, and was adopted by the court as its opinion.

Affirmed.

LIVINGSTON, C. J., and GOODWYN, COLEMAN and HARWOOD, JJ., concur.