On Application for Rehearing
The opinion of June 28, 1996, is withdrawn, and the following opinion is substituted therefor. Willie George Wilson appeals from an adverse ruling in an action for a declaratory judgment filed by Annie Ruth Harris.
In 1989, Harris sued Sears, Roebuck Company, and other defendants, for the wrongful death of her daughter, who died from carbon monoxide poisoning due to a faulty water heater. In February 1992, a Lowndes County jury awarded Harris $4 million. One defendant settled with Harris and two defendants appealed. See Sears, Roebuck Co. v. Harris, 630 So.2d 1018 (Ala. 1993), cert. denied, 511 U.S. 1128, 114 S.Ct. 2135, 128 L.Ed.2d 865
(1994).
Harris's wrongful death case was pending on appeal for two years. During that time, Harris told Wilson, a friend she had known for 20 years, that she was in great financial need, and she asked Wilson to advance her money. Wilson agreed to give Harris up to $400 per month if Harris would assign to him a portion of any recovery she eventually realized from her lawsuit. Harris signed two agreements, dated April 7 and April 22, 1992, respectively, that provided the following:
"The April 7 Agreement
 "The following agreement has been entered into by Annie Ruth Harris and Willie George Wilson, with the stipulation that this is the first part of an assignment that will be later drawn up between the above mentioned parties.
 "Annie Ruth Harris, by signing this agreement hereby states that she is aware of the terms of this loan and is in agreement with it herein. And that by no means was she tricked into agreeing or manipulated by Willie G. Wilson to sign this agreement. "Willie G. Wilson is loaning $1,300.00 as of this day (April 7, 1992). Upon a later date this agreement shall be an additive to an original assignment in which Annie Ruth Harris will agree to pay Willie G. Wilson 15% of monies recovered from all lawsuits she has pending. Other loans will be made from time [to time] up to $400 per month. "This agreement shall be made more defined in the assignment that will be drawn up in the near future between both parties."
"The April 22 Agreement
 "For value received, I hereby transfer and assign to WILLIE G. WILSON, one-third (1/3) of the money due or to become due under the Judgment in Lowndes *Page 267 
County Civil Case # CV 90-35 dated 3-10-92 against State Industries, and Sears, with full power and authority to collect said sum as it becomes due and to give a receipt therefor in full discharge of said portion of the obligation."
Without consulting her attorneys in the lawsuit, Harris signed both agreements in the law office of Wilson's attorney. The attorney's secretary testified by deposition that both she and the attorney explained the agreements to Harris before Harris signed them. The secretary recalled the following version of the event:
 "[W]hen [Harris] did it, I said '[O]kay, you got it straight now, you know what you're doing, right?' And she said, '[Y]eah, I know.' I said, '[O]kay, that means now if you got three million dollars, you know, by you signing it, that's gonna mean that Willie George could get a million.
 "She said, 'I know that. I know that. I know George. I've known George a long time. He's my friend and I want to do it, you know.' And she said, you know, she just let me know that she knew what she was doing. And I mean, even joked, you know to the point where, you know '[A] lot of people say that my oldest son is Willie George's anyway.' And I said, '[O]h, okay.' I said, '[T]hat's cool, you know, go ahead, you know.' . . . I didn't — I didn't have any reason to think that she didn't understand it, you know, because she was adamant about doing it. She wanted to do it."
Harris denied that either Wilson's attorney or the attorney's secretary explained the agreements to her. She stated that when she signed the agreements, she read them and she knew what they said, but she did not understand what they meant. Harris stated that her understanding of the agreement was that if she recovered any money from the lawsuit, she would pay Wilson what she had borrowed plus "some extra money and the interest." On the other hand, if she did not recover any money from the lawsuit, she would not have to pay Wilson anything.
Harris testified by deposition that when she asked Wilson for a loan, "he told [her] about a contract he would have to draw up for [her] lawsuit, that he would get some of the — he would get half of the money." However, when Harris was asked whether she understood that, in the event she recovered, she would owe Willie George a percentage of the award, the following occurred:
 "A. I know I had to pay him back. I didn't know it was that much.
"Q. But you knew it was a percentage?
 "A. A percentage. I did not know how much of a percentage."
When questioned about her understanding of the agreement to pay her lawyers a percentage of her recovery in the lawsuit, Harris testified:
 "Q. And you paid your attorneys who represented you by a percentage, didn't you?
 "A. I guess it was by percentage. I thought it was by the hour.
 "Q. You paid them by a percentage just like you made a deal to pay Mr. Willie George Wilson by a percentage, didn't you?
". . . .
 "A. I did not know. Like I said, I did not know what that percent was. At the time when I signed the papers and I told them that I hired them to work for me, I did not know what the percentage was.
"Q. So you had —
 "A. That's what I was really stating. I do not know what the percent is. If they say two percent, I would not know what that would mean
 "Q. So you had the same understanding of the contract you had with your attorneys as you had with Mr. Willie George Wilson?
"A. Yes."
Harris dropped out of school in the eleventh grade. She later received a GED certificate and completed training as a practical nurse or nurse's aide. She has six children and is presently divorced from her second husband. Her first husband died. She testified that she can read and write, but that she "had never been good at math." *Page 268 
Wilson completed the seventh grade in school. When asked if he could read, he responded, "Not very well. Not enough to feel comfortable with it." He is a self-employed home-builder. He testified by deposition that, sometimes, people want to buy his houses, but they cannot get financing, so he lets them make monthly payments to him until they can obtain conventional financing. He stated that he was not in the business of lending money, but "[i]f a person is in need and I know he's in need and if I have it, I lend [money] to him." He denied ever charging interest on such transactions. He also stated that he had entered into agreements like the one he had with Harris with other people. He described one such agreement as follows:
 "[Odessa Adams] came to me and wanted to borrow some money to save her car [from being repossessed] and some other things. And she told me about a lawsuit that she had pending. . . .
 "And the lawsuit — the only way that she will be able to pay me back, if and when she win the lawsuit. If she doesn't win the lawsuit, she's not able to pay me back."
From March 1992 to June 1994, Wilson advanced funds to Harris in the amount of $4749.
In June 1994, when Harris learned that the appeal of her lawsuit had been concluded, she refused to pay Wilson one-third of her share of the judgment. Instead, she filed a declaratory judgment action seeking to have her agreements with Wilson declared void. Wilson filed a counterclaim alleging breach of contract and promissory fraud.
The trial court ruled that the agreements amounted to a series of loans that were unconscionable under Ala. Code 1975, § 5-19-16 (the Mini-Code). It also concluded that the agreements constituted gambling contracts that violated Ala. Code 1975, § 8-1-150, and were therefore unenforceable. The court found no factual merit to Wilson's promissory fraud claim, but determined that even if Harris had had no intent to perform her portion of the agreements, public policy would still prevent Wilson's recovery. The court granted a partial summary judgment for Harris, but entered a judgment in favor of Wilson in the amount of $4749, the total of his advancements to Harris. Wilson appealed to the Alabama Supreme Court, and the supreme court transferred the cause to this court for lack of jurisdiction.
 Unconscionability
The trial court held that the agreements at issue were unconscionable loans under § 5-19-16 (the Mini-Code). Wilson argues that the provisions of the Mini-Code do not apply to him because he is not a "creditor" within the meaning of §5-19-1(3). That section refers to those "who regularly extend or arrange for the extension of credit for which the payment of a finance charge is required."
We need not decide whether Wilson is a "creditor" within the meaning of the Mini-Code or whether the agreements are unconscionable because we hold that the trial court's judgment was correct on other grounds.
 Gambling Contracts
Section 8-1-150, Ala. Code 1975, provides that "[a]ll contracts founded in whole or part on a gambling consideration are void." In Thornhill v. O'Rear, 108 Ala. 299, 19 So. 382
(1896), our supreme court observed that a gambling contract involves a wager and, defining "wager," the court stated:
 "A wager is nothing more than a bet, 'by which two parties agree that a certain sum of money, or other thing should be paid or delivered to one of them on the happening or not happening of an uncertain event.' "
108 Ala. at 302, 19 So. at 383 (citation omitted). The agreement here was that Harris would pay Wilson a sum of money upon the happening of an uncertain event over which neither party had control — Harris's recovery of damages after her personal injury lawsuit survived the appellate process.
Citing State v. Stripling, 113 Ala. 120, 123, 21 So. 409, 410
(1897), Wilson argues that the agreement is not a gambling contract because a gambling contract is one "whereby one party will be the gainer, and the other a loser," and under this agreement, Wilson claims, both parties will be gainers. That argument is unfounded in logic or common *Page 269 
sense. We doubt that Harris would consider herself a "gainer" if she were required to give Wilson $833,000 in exchange for the $4749 advanced to her.
In the alternative, Wilson argues that if the agreements were gambling contracts, then Harris's action was untimely, because § 8-1-150 requires that an action to recover sums paid pursuant to a gambling contract must be brought within six months of the time of payment. That portion of the statute is obviously not applicable here. Harris paid no sums pursuant to the agreement. Instead, she filed a declaratory judgment action to have the agreement declared unenforceable.
In O'Farrell v. Martin 161 Misc. 353, 292 N.Y.S. 581
(N.Y.Cty.Ct. 1936), the New York court dealt with an agreement similar to the one before us. In that case, a woman agreed to give her son-in-law half the proceeds of an insurance policy on the life of her daughter, and the son-in-law promised to give his mother-in-law part of the proceeds of a pending lawsuit alleging the wrongful death of his wife. In response to the argument that the agreement was void as a "gambling contract," the New York court held:
 "If there were no relationship by affinity between the parties, the court might feel constrained to hold the agreement by [the son-in-law] one for a wager. But a gambling contract generally exists only between parties who have no interest in the subject-matter except as to the possible gain or loss resulting, while here the [mother-in-law] did have a legitimate interest in the outcome of the litigation. I think that as a result of this relationship the transaction is not within the purview of the statutes against gambling.
 "The class of cases which the agreement at bar most nearly approaches is that of an assignment to a layman of part of a cause of action in consideration of an advancement for payment of the costs thereof. At common law such an agreement was void as champerty and maintenance. That is no longer true. Hence, if the assignment of part of the insurance proceeds had been for the purpose of carrying on the litigation the agreement would be valid. I can see little if any distinction between such a case and the one now before me."
161 Misc. at 355, 292 N.Y.S. at 584-85 (citations omitted).
The factors which led the O'Farrell court to uphold the agreement and to find that it was not a gambling contract are absent here: Harris and Wilson are not related to each other by consanguinity or affinity, and Wilson had no legitimate interest in the outcome of the lawsuit other than the recovery of money. Those same factors indicate that the agreements here partake of some of the elements of champerty alluded to by theO'Farrell court.
 "It is generally held to be champerty for a person who is without interest in a suit, and is not a party or an attorney or relative of a party, to intrude and speculate in the litigation by agreeing to defray the expenses, or to give aid and support in the preparation and prosecution, of the suit in consideration of a share of the recovery or the proceeds thereof. . . . It is not maintenance to furnish assistance, in money or otherwise, to a poor litigant to enable him to carry on his suit if the advancement is made for reasons of charity or friendship and not for profit. Such a transaction must be entered into with the view of subserving the ends of justice alone, and if it is turned to the purpose of speculation by a stipulation for a share of the verdict or judgment it will amount to champerty."
14 C.J.S. Champerty and Maintenance § 12 at 156 (1991).
All of the elements of champerty do not exist here. Wilson did not provide financial aid to Harris in order to enable her to prepare and prosecute the wrongful death action against Sears; Harris already had a judgment on appeal in that action when Wilson became involved. The Wilson-Harris agreements are therefore not, strictly speaking, champertous. See Lott v.Kees, 276 Ala. 556, 558, 165 So.2d 106, 108 (1964) (at common law, champertor was one who aided a suit or carried on a suit at his own expense); Weinberg v. Magid, 285 Mass. 237,189 N.E. 110 (1934) (champertous agreement is one made in contemplation of litigation); Young *Page 270 v. Young, 196 Mich. 316, 162 N.W. 993 (1917) (champertor is one who stirs up litigation).
Even though the agreement in this case does not satisfy all the requirements for champerty, we believe that it nevertheless violates the public policy against gambling and speculating in litigation. As our supreme court observed in Lott v. Kees, supra:
 "The doctrine of champerty is directed against speculation in lawsuits and to repress the gambling propensity of buying up doubtful claims. . . . [A]greements should be carefully watched and closely scrutinized, when called in question, and if found to have been made . . . for the purpose of gambling in litigation, or to be so extortionate or unconscionable as to be inequitable against the party, effect ought not to be given to them."
276 Ala. at 560, 165 So.2d at 110 (quoting Brown v. Bigne,21 Or. 260, 266, 28 P. 11, 13 (1891)).
In Hackett v. Hammel 185 Minn. 387, 241 N.W. 68 (1932), the Minnesota court construed an agreement to finance a lawsuit for a tenfold share of the verdict as champertous. The court observed:
 "The vice of [the champertous agreement] was that a layman, with no interest in the lawsuit or its subject matter and no relation to defendant, advanced money to carry on the litigation, not as a loan, but to speculate upon and purchase a share in the outcome. In the case of defeat, plaintiff would have gotten nothing. But, if victory came, he would have gotten ten times his investment. Such speculation in litigation in which the adventurer has no interest otherwise and where he is in no way related to the party he aids, is champertous. The element of intrusion for the purpose of mere speculation in the troubles of others introduces the vice fatal to what otherwise would be a contract."
185 Minn. at 388, 241 N.W. at 69 (emphasis added).
Despite the fact that Wilson's involvement in Harris's lawsuit was post-trial, many of the evils pointed out by theHackett court inhere in the Wilson-Harris agreement. Wilson, who had no relation to Harris and no legitimate interest in her lawsuit, engaged in speculation as to the outcome of the case for a share of the proceeds in the event of her success. We think such an agreement violates public policy and is void.
 "The question whether an agreement is void on the ground that it is contrary to public policy is to be determined by its general tendency. If that is opposed to the interests of the public, the agreement is void, even though in the particular case the intent of the parties may have been good and no injury to the public may have resulted. It matters not that any particular contract is free from any taint of fraud, oppression, or corruption. . . . The law looks to the general tendency of such agreements, and it closes the door to temptation, by refusing them recognition in any of the courts of the country. It is enough that the contract belongs to a class which has a tendency contrary to the public good, although in particular instance, no injury results."
Sampliner v. Motion Picture Patents Co., 255 F. 242, 251-52 (2d Cir. 1918), rev'd on other grounds, 254 U.S. 233, 41 S.Ct. 79,65 L.Ed. 240 (1920).
The general tendency of the Wilson-Harris agreement is opposed to the public interest because it condones speculation in litigation, makes sport of the judicial process, and tempts the unscrupulous to prey upon the distress of the ignorant and unfortunate. We hold that the agreement violates public policy and is therefore void because it is supported by a gambling consideration and its speculative characteristics make it closely akin to champerty.
The judgment of the trial court is affirmed.
ORIGINAL OPINION WITHDRAWN; OPINION SUBSTITUTED; APPLICATION FOR REHEARING OVERRULED; RULE 39(k) MOTION GRANTED IN PART AND DENIED IN PART; AFFIRMED.
THIGPEN, YATES, and MONROE, JJ., concur.
ROBERTSON, P.J., concurs in the result. *Page 271